356 F.2d 749
 Peter M. ELLIOTT, Trustee for Van's Market, etc., Appellant,
v.
A. J. BUMB, Trustee for Security Currency Services, Ltd., and Corporations Commission of State of California, Appellees.
 No. 20095.
 United States Court of Appeals Ninth Circuit.
 February 9, 1966.
 Rehearing Denied March 22, 1966.
 
 Craig, Weller & Laugharn, Robert A. Fisher, Los Angeles, Cal., for appellant.
 Sulmeyer & Kupetz, Robert W. Alberts, Los Angeles, Cal., Thomas C. Lynch, Atty. Gen., Arthur C. De Goede, David W. Halpin, Deputy Attys. Gen., Los Angeles, Cal., for appellees.
 Before CHAMBERS, HAMLEY and ELY, Circuit Judges.
 ELY, Circuit Judge:
 
 
 1
 On or about November 15, 1962, a written "Agency Franchise and Trust Agreement" was executed by and between Van's Market and Security Currency Services, Ltd. In the agreement, Security appointed Van's as its "Agent for the purpose of issuing Money Orders" and Van's agreed to hold all proceeds for the face value of money orders issued, plus fifty percent of the fees therefrom, in trust for Security and entirely separate and apart from other funds in Van's possession.[1]
 
 
 2
 Neither of the two companies fared well financially. On October 15, 1963, Van's executed a general assignment for the benefit of creditors to the Credit Managers Association of Southern California and ceased to do business. Subsequently, on November 19, 1963, an Involuntary Petition in Bankruptcy was filed against Van's and it was adjudged a bankrupt on March 5, 1964. Peter M. Elliott is the duly appointed, qualified, and acting trustee of Van's estate. Security filed a petition under the provisions of Chapter XI of the Bankruptcy Act on January 16, 1964, and its bankruptcy was adjudicated. A. J. Bumb is the trustee in bankruptcy for Security.
 
 
 3
 There is due to Security from Van's the sum of $3,109.16, proceeds from the sale of money orders and checks sold by Van's as agent for Security in the amount of $3,092.99 and an additional sum of $16.17 in fees for the sale of certain checks. The obligation flows from transactions occurring before October 15, 1963, the date of Van's assignment for the benefit of creditors. All the money orders and checks sold by Van's were honored and paid by Security. The Credit Managers Association presently holds $2,014.99 which was on deposit in Van's bank account prior to October 15, 1963 and which was received by Van's from its sale of money orders for Security. The balance due, $1,094.17, was commingled by Van's with its other assets.
 
 
 4
 Elliott, trustee of Van's, applied for an order that Bumb (Security's trustee), the Credit Managers Association,[2] and the Corporations Commissioner for the State of California[3] show cause why orders should not be entered declaring "any statutory lien" in favor of Bumb, Security, or the Corporations Commissioner, with respect to any funds of the estate of Van's, to be null and void pursuant to section 67c(2) of the Bankruptcy Act, 11 U.S.C. § 107(c) (2) (1964),[4] and ordering the Credit Managers Association to remit to Elliott, for Security, the funds which it held. The order to show cause was issued on September 18, 1964, and in answer, Bumb asserted that his claim to the money properly rested upon Security's status as the beneficiary of a trust fund under the express provisions of section 12300.3 of the California Financial Code.[5] He alleged that the California statute created a true trust and not a statutory lien which would be unenforceable under section 67c (2) of the Bankruptcy Act. The Referee in Bankruptcy, rejecting Bumb's contentions, held that any trust claimed to have been created in favor of Security pursuant to sections 12300.3 and 12300.4[6] of the California Financial Code was, as against Van's, wholly invalid and that the funds in question should remain assets of Van's estate, free and clear of any right, title, lien, or other interest whatsoever in favor of the estate of Security. He directed that the $2,014.99 held by the Credit Managers Association be released to Elliott for the estate of Van's. On review, the District Court reversed the Referee's decision, holding that proceeds from the sale of money orders and checks by Van's as agent for Security, whether deposited to a trust account or commingled with assets of Van's, constituted trust funds not subject to the provisions of section 67c of the Bankruptcy Act. Elliott made a timely appeal, properly invoking our jurisdiction under 11 U.S.C. § 47 (1964).
 
 
 5
 It is contended that the District Court made the following errors:
 
 
 6
 (1) In concluding from the facts, and as a matter of law, that proceeds from the sale of money orders and checks by Van's Market, as agent for Security Services, Ltd., whether
 
 
 7
 (a) deposited to a trust account, or
 
 
 8
 (b) commingled with assets of Van's, constitute trust funds under sections 12300.3 and 12300.4 of the California Financial Code;
 
 
 9
 (2) In concluding, as a matter of law, that any trust created by sections 12300.3 and 12300.4 is not subject to the provisions of section 67c of the Bankruptcy Act, 11 U.S.C. § 107(c) (1964);
 
 
 10
 (3) In not finding that no express, constructive, or resulting trust existed under principles of common law;
 
 
 11
 (4) In not concluding, as a matter of law, that any statutory trust created by sections 12300.3 and 12300.4 should be treated as a statutory lien for application of federal bankruptcy laws;
 
 
 12
 (5) In not concluding, as a matter of law, that any such trust so created is merely a state-created priority and invalid pursuant to section 64a(5) of the Bankruptcy Act, 11 U.S.C. § 104(a) (5) (1964).[7]
 
 
 13
 There are actually two amounts to which we must direct our consideration, (1) the $2,014.99 on deposit in Van's bank account prior to the assignment for the benefit of creditors and which represents segregated funds received for money orders sold by Van's as agent for Security; and (2) the balance of the $3,109.16 due to Security, $1,094.17, which was commingled by Van's with its other assets.
 
 
 14
 As to the identifiable sum of $2,014.99, the District Court made the correct determination in favor of Security's trustee. Although one may become bankrupt, property which is held by him in trust belongs to the beneficiary of the trust. 4 Collier, Bankruptcy ¶ 70.25[2] (14th ed. 1964) [hereinafter called Collier]; 3 Remington, Bankruptcy § 1212 (Henderson ed. 1957). Apart from the provisions of the California Financial Code, the segregated amount is corpus of a trust. The bankrupts' written agreement was a valid trust agreement under California law. See Cal.Civ.Code §§ 2221, 2222. While no trust corpus existed as of the time of the agreement, it has been held, in equity, that if parties intend to create a trust at a future time when the corpus comes into being, the trust should take effect at such future time and the equitable interest pass to the beneficiary. I Bogert, Trusts and Trustees § 113, pp. 575-76 (2d ed. 1965). Generally, the question of whether a trust is established is one to be resolved by the application of state law. See Jaffke v. Dunham, 352 U.S. 280, 281, 77 S.Ct. 307, 1 L.Ed.2d 314, (1957). Although no California court has ruled directly upon the question in a cause involving such an explicit trust agreement as that made by the bankrupts here, the California Supreme Court has written, "A mere promise to obtain money and thereupon hold it in trust does not create a trust until it is at least so far executed that the money has been obtained in accordance with the promise." Molera v. Cooper, 173 Cal. 259, 262, 160 P. 231 (1916). (Emphasis added.) See also 89 C.J.S. Trusts § 24, p. 741, and § 151, pp. 1064, 1068 (1955); Restatement (Second), Trusts § 30 (1959). From the quoted language, it must be inferred that California courts would hold, under the terms of the explicit agreement here, that a trust actually came to be established upon the receipt of those corpus funds which were so clearly anticipated in the agreement precisely defining their trust quality and manner of handling. Furthermore, even had there been no written agreement, the relationship of Security and Van's as principal and agent would seem to have required the impressing of a constructive trust upon funds received by the agent from the sale of his principal's property and retained by the agent in segregated identity. See Rodes v. Shannon, 222 Cal. App.2d 721, 725, 35 Cal.Rptr. 339 (1963); Spector v. Miller, 199 Cal.App.2d 87, 95, 18 Cal.Rptr. 426 (1962); Darrow v. Robert A. Klein & Co., 111 Cal.App. 310, 295 P. 566 (1931); Cal.Civ.Code § 2322. Therefore, as to the $2,014.99, in existence and clearly identified, the trustee of Security's estate is entitled to the fund.
 
 
 15
 As to the remaining $1,094.17, commingled with other money, our determination is fraught with more difficulty. Under the provisions of the California statute all assets of Van's would be impressed with a trust in favor of Security in an amount equal to the aggregate funds received from the sale of the checks and money orders and the trust would remain until payment of the amount due to Security. Cal.Fin.Code § 12300.3. By impressing a trust on all assets of the agent, the statute would relieve check and money order principals from the burden of tracing commingled funds. Generally such burden falls upon the beneficiary of a trust. In re J. M. Acheson Co., 170 F. 427 (9th Cir. 1909). As Collier has written:
 
 
 16
 "The basic idea of the trust doctrine as applied in bankruptcy is a fair and reasonable identification of the property or fund so as not to harm other creditors. It is not enough, therefore, to show merely that the funds or property came into the bankrupt's hands or went into the bankrupt's business or, by the better view, even that the funds or property are contained somewhere within the bankrupt's estate. If the trust fund or property cannot be identified in its original or substituted form, the cestui becomes merely a general creditor of the estate, for the prevailing rule in trusts is that `a beneficiary who cannot find the trust property has no lien or charge spread over the entire estate of the faithless trustee.'"
 
 
 17
 4 Collier ¶ 70.25[2], pp. 1216-18. (Citations omitted.)
 
 
 18
 In this case, however, the state statute undertakes to dispense with the beneficiary's need to trace. Generally, state law governs the determination of whether a beneficiary has sufficiently identified trust property, but,
 
 
 19
 "There is the further question, and this a federal one: what is the distribution contemplated by the Bankruptcy Act in the situation at bar? State trust law must not be allowed to pervert or override the distributive provisions of the Bankruptcy Act. A state rule which purports to fasten a general lien on a person's estate in the event of insolvency or a general liquidation must be regarded as a priority in disguise and incompatible with the order of distribution prescribed for bankruptcy. The adoption of § 64a(5) and § 67c of the Bankruptcy Act was intended to make clear that state rules of priority of distribution must yield in bankruptcy cases to that prescribed by the Act."
 
 
 20
 4 Collier ¶ 70.25[2], pp. 1224-1225. In an early case, after recognizing that under applicable state law the owner of a trust fund was entitled to a preference as to the entire body of the estate of an insolvent trustee when the trustee had mingled the trust fund with his own property, the court held that federal bankruptcy law could not allow such a preference and that the beneficiary, unable to trace the trust property, must share in the estate on the same basis as general creditors. John Deere Plow Co. v. McDavid, 137 F. 802, 812 (8th Cir. 1905). Since the time of that decision, Congress has made even clearer its intent that state law shall not be permitted to confer preference on one class of the creditors of one adjudged a bankrupt under federal law, even though the state may have the highest public purpose in attempting to do so. See, e. g., 2 U.S.Code Cong. & Ad. News p. 1973 (1952). So it is that section 64 of the Bankruptcy Act eliminates all state-created priorities save one (rent). 11 U.S.C. § 104 (1964). And statutory liens not accompanied by "possession of" or by "levy upon" the property subject to lien before the filing of the petition in bankruptcy are invalidated by section 67c (2) of the Bankruptcy Act. 11 U.S.C. § 107(c) (2) (1964).
 
 
 21
 If state law is contrary to federal bankruptcy law, the state law must yield.[8] Giving effect to the provisions of section 12300.3, which would impress a trust upon commingled funds, would open the door to state creation of priorities in favor of various classes of creditors by labeling such priorities as "trusts". This would tend to thwart or obstruct the scheme of federal bankruptcy. It may be true that Congress was aware of statutory trusts when it made its most recent amendments to the bankruptcy law, for courts were previously confronted with state statutory trusts in bankruptcy cases. E. g., In re Treister & Son, Inc., 145 F.Supp. 144 (S.D.N.Y. 1956); Albert Pick Co. v. Travis, 6 F. Supp. 486 (E.D.N.Y.1933). We cannot believe, however, that Congress contemplated that if trust funds are commingled with other assets of one subsequently declared bankrupt under federal law, a state statute may impress a trust on all assets of the bankrupt's estate to the extent of the amount due the beneficiary. We find no prior case authority which would have adequately warned Congress of the possibility of such a result, and we have pointed to direct authority for the opposite conclusion. John Deere Plow Co. v. McDavid, supra. We hold that the provisions of section 12300.3 of the California Financial Code, insofar as they would establish a trust on the commingled funds, are in such conflict with the federal bankruptcy scheme that they cannot be given effect in the case at bar. The cause is remanded so as to afford to appellee the opportunity to attempt to trace the sources of the commingled funds.
 
 
 22
 Affirmed in part, reversed in part.
 
 
 
 Notes:
 
 
 [1]
 The agreement provided:
 "[1. Agent shall accept responsibility and liability for properly issuing all Money Orders and shall account for and remit all proceeds for face value issued plus 50% of fees therefrom to Security; Agent shall hold all said moneys in trust for Security entirely separate and apart from other funds in possession of Agent until remitted. Agent shall twice weekly render to Security, a true and correct written statement of all funds received to date of report by Agent, accompanied by all said funds. Agent shall be solely and wholly liable and accountable for all moneys received by Agent pursuant to this Agreement up to and until Agent delivers physical possession thereof to Security or its designated depositary. Agent shall maintain accounts and records of all transactions and same shall be maintained by Agent not less than two years from date of said transactions.]"
 
 
 [2]
 The Credit Managers Association of Southern California asserts no claim to the $2,014.99 held by it but merely seeks a determination as to who they should pay, appellant, or appellee A. J. Bumb
 
 
 [3]
 The Corporations Commissioner of the State of California asserts no claims to the funds held by appellant nor to the funds held by the Credit Managers Association, but as it is charged with the responsibility of enforcing the Check Sellers and Cashers Law, Cal. Fin. Code §§ 12000, et seq., it is thus concerned with the interpretation placed upon said law by this court
 
 
 [4]
 "(c) Where not enforced by sale before the filing of a petition initiating a proceeding under this title, and except where the estate of the bankrupt is solvent: * * *
 "(2) the provisions of subdivision (b) of this section to the contrary notwithstanding, statutory liens created or recognized by the laws of any State for debts owing to any person, including any State or any subdivision thereof, on personal property not accompanied by possession of, or by levy upon or by sequestration or distraint of, such property, shall not be valid against the trustee: * * *."
 
 
 [5]
 "§ 12300.3
 All funds received by a licensee or its agents from the sale of checks, drafts, money orders, or other commercial paper serving the same purpose and for the purpose of paying bills, invoices, or accounts of an obligor, equal in amount to the face value of such instruments or equal to the amount to be paid, shall constitute trust funds owned by and belonging to the person from whom they were received or a licensee who has paid the checks, drafts, money orders or other commercial paper serving the same purpose, for which the funds of such persons have been received by the agent but not transmitted to such licensee or deposited in the trust account of such licensee. If a licensee or an agent of a licensee shall commingle such funds with those of his own, all assets of such agent shall be impressed with a trust in favor of said purchaser or the licensee in an amount equal to the aggregate funds received or which should have been received by the agent from such sale. Such trust shall continue until an amount equal to said funds is separated from those of the agent and transmitted to the licensee or deposited in the trust account of licensee. An amount equal to all such trust funds shall be deposited in a bank or banks in an account or accounts in the name of the licensee designated `trust account,' or by some other appropriate name indicating that the funds are not the funds of the licensee or of its officers, employees, or agents. Such funds, or, in the event of the commingling of such funds by licensee or its agent with those of the licensee or its agent, an amount of funds of such licensee or of its agent equal thereto, shall constitute trust funds as herein provided and shall not be subject to attachment, levy of execution or sequestration by order of court except by a payee, or bona fide assignee, or bona fide holder in due course of a check, draft, or money order sold by a licensee, or except by an obligor for whom a licensee is acting as an agent in paying bills. Funds in said account, together with funds and checks on hand and in the hands of agents held for the account of the licensee, at all times shall be at least equal to the aggregate liability of the licensee on account of checks sold and bills, invoices, and accounts accepted for payment.
 "Nothing in this law shall be construed to prevent a purchaser, a holder in due course, the payee of a check, draft or money order sold by the licensee in the usual course of his business, or an obligor for whom the licensee is acting as an agent in paying bills of the obligor, from taking any legal action necessary to enforce any claims which said purchaser, holder in due course, payee, or obligor may desire to take including the right to levy attachment or execution.
 "In the event a license under this law shall be suspended or terminated the licensee shall immediately deposit in said trust account an amount which with funds therein contained shall be equal to the outstanding checks sold and bills unpaid."
 
 
 [6]
 "§ 12300.4
 Prior to such separation and transmittal to the licensee or deposit by its agent such funds received by said agent may be used by said agent for the sole purpose only of the making of change or cashing of checks in the normal course of its business. All such funds received by said agent to the date of deposit or transmittal as required below or an amount equal to such funds must be separated from those of the agent and transmitted to, or deposited in the trust account of, the licensee not less than every third business day. If an agent owns or operates, either directly or indirectly, more than two locations for the sale of checks, drafts, money orders, or other commercial paper serving the same purpose and/or for the receipt of money for the purpose of paying bills, invoices or accounts of an obligor, and handles trust funds in any three-day period equal to or in excess of securities to be deposited as provided in Section 12223, said agent shall transmit to, or deposit in the trust account of, the licensee directly from each such location of such agent such funds not later than the end of the next business day following receipt; such funds to be in form of cash or checks cashed in the normal course of business only.
 "Where the total amount of such funds held by an agent does not exceed one thousand dollars ($1,000) in a calendar week, the commissioner may, in his discretion, by written order permit the agent to transmit or deposit such funds in periods in excess of 3 days but not more than 10 days.
 "If, after reasonable notice from licensee, an agent shall fail to transmit or deposit the funds, or an amount equal thereto, or to report to the licensee, as herein provided without just cause, or if an agent shall use any of such funds, directly or indirectly, for any purpose other than is permitted herein, licensee shall immediately terminate such agency and within five (5) days thereafter notify the commissioner in writing of the reason for such termination, setting forth the name and address of the agency location. No agent so terminated shall be permitted to become an agent of the licensee or any other licensee except as provided in Section 12301.4 of the Financial Code."
 
 
 [7]
 "(a) The debts to have priority, in advance of the payment of dividends to creditors, and to be paid in full out of bankrupt estates, and the order of payment, shall be * * *
 "(5) debts owing to any person, including the United States, who by the laws of the United State in[1] entitled to priority, and rent owing to a landlord who is entitled to priority by applicable State law: * * *."
 "[1. So in original. Probably should read `is'.]"
 
 
 [8]
 The Constitution of the United States provides that "The Congress shall have Power * * * To establish * * * uniform Laws on the subject of Bankruptcies throughout the United States; * * *." U.S. Const. Art. I, § 8. The Constitution also provides that the laws of the United States made in pursuance of the Constitution "shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or laws of any State to the Contrary notwithstanding." U.S. Const. Art. VI