**In re HURRICANE ELKHORN COAL CORPORATION II.**

**FIRST NATIONAL BANK OF LOUISVILLE, Plaintiff,**

v.

**HURRICANE ELKHORN COAL CORPORATION II, Defendant and Cross-Plaintiff,**

and

**Logan & Kanawha Coal Company, Inc., Defendant and Cross-Defendant.**

**Civ. A. No. 82–0410–L(G).**

United States District Court,
W.D. Kentucky,
at Louisville.

Sept. 1, 1983.

ORDER

JAMES F. GORDON, District Judge.

Before the Court is an appeal from Orders of the Bankruptcy Court entered on April 28, 1982, 19 B.R. 609 (Bkrtcy.W.D.Ky. 1982), and June 10, 1982, 20 B.R. 631 (Bkrtcy.W.D.Ky.1982). They required Logan & Kanawha Coal Co., Inc., (L & K) to pay $84,652.60 to First National Bank of Louisville (Bank). The Bank was financing the operations of the debtor, Hurricane Elkhorn Coal Corporation II, under a plan approved by the Bankruptcy Court after the debtor sought Chapter 11 relief. The Bank brought this action, claiming that L & K was wrongfully refusing to turn over money it obtained as the debtor's coal broker. L & K was refusing to turn over the money because it allegedly had overpaid the Bank that amount during time before the debtor filed for Chapter 11 relief.

Over L & K's objections, the Bankruptcy Court held that it did have jurisdiction over the Bank's claim, that L & K could not recover the $84,652.60 under applicable restitution principles, and that L & K's retention of the money violated the automatic stay provisions of 11 U.S.C. § 362. We agree with Bankruptcy Judge Merritt S. Deitz, Jr.'s extremely able jurisdictional analysis and have little to add by way of affirmance. But we disagree with the conclusion that L & K was not entitled to claim the $84,652.60 under applicable restitution principles. Thus, we reverse that part of the Bankruptcy Court's decision and remand for a determination whether relief from the automatic stay is appropriate under 11 U.S.C. § 362(d).

I.

The Bankruptcy Court's determination that it had jurisdiction over this dispute rested on its conclusion that the money at issue was part of the debtor's estate, as expansively defined in 11 U.S.C. § 541. That provision includes in an estate "all legal and equitable interests of the debtor in property as of the commencement of the case." In brief, the Court concluded that

the debtor had an interest in the money because of the nature of the financing arrangement with the Bank.

Under the financing arrangement, the Bank first created a $1.8 million line of credit in favor of Hurricane Elkhorn. From that line of credit, the Bank would advance money into Hurricane Elkhorn's operating account as Hurricane Elkhorn shipped coal away from its mine. These advances would be secured by accounts receivable which Hurricane Elkhorn would obtain from the purchasers of its coal, and which Hurricane Elkhorn would assign to the Bank. Later, when the purchasers paid Hurricane Elkhorn's coal broker, L & K, L & K would deduct its commission and forward the remainder of the sale proceeds to the Bank. The Bank would then exercise its discretionary authority to apply these proceeds toward the restoration of Hurricane Elkhorn's line of credit, toward the payment of interest and management expenses Hurricane Elkhorn had incurred, and toward the augmentation of Hurricane Elkhorn's operating account.

This action arose because L & K mistakenly paid the Bank too much several times when it was forwarding the proceeds from Hurricane Elkhorn's coal sales. The parties do not dispute that L & K overpaid the contested amount. Instead, because L & K withheld this amount from sales made after Hurricane Elkhorn filed its petition, even though the overpayments apparently occurred before Hurricane Elkhorn filed its petition, the Bank charged that L & K was diverting part of the debtor's post-petition estate in violation of the automatic stay provisions of the Bankruptcy Act, 11 U.S.C. § 362(a). L & K's primary response was that the debtor had no interest in the transactions between the Bank and L & K and thus the Bankruptcy Court had no jurisdiction under 11 U.S.C. § 541. This was allegedly because Hurricane Elkhorn had irrevocably assigned its receivables to the Bank, and according to L & K, had no interest in whether the Bank collected some, all, or more than the amounts covered by the receivables.

The Bankruptcy Court's analysis of this issue is thorough and authoritative, and we readily adopt it for our own. Plainly the debtor had an interest in how much the Bank was paid, because those amounts were used to restore Hurricane Elkhorn's line of credit, pay the principal it owed, pay its interest and management expenses, and build its operating account. If the Bank was paid $84,652.60 by mistake, then both the Bank and Hurricane Elkhorn were affected by gaining legal title to money they otherwise wouldn't have had.

II.

Somewhat more difficult is the issue whether L & K is now entitled to recover the $84,652.60 it overpaid. The Bankruptcy Court essentially concluded that L & K's overpayments only made it a general creditor instead of a beneficiary of a constructive trust created in equity. The Court took this position because it said that even if a constructive trust could be created, L & K could not trace its overpaid money to specific funds. The Court relied on federal decisions that have made such tracing a prerequisite to the recovery of a constructive trust. Tracing principles are notoriously difficult to apply; because we would administer them differently, we reverse and hold that L & K is entitled to recover the overpaid $84,652.60.

A.

■ In resolving this issue, we must first determine that a constructive trust should be created under Kentucky law, *Jaffke v. Dunham,* 352 U.S. 280, 281, 77 S.Ct. 307, 308, 1 L.Ed.2d 314 (1957). While *Collier on Bankruptcy* states unequivocally that "[m]oney paid to the debtor prior to bankruptcy under a mistake of fact is impressed with a constructive trust that follows it into the hands of the estate," 4 *Collier on Bankruptcy* ¶ 541.13 at 541–67 (15th ed. 1979), that conclusion is not effortlessly reached in Kentucky law. For at the outset, it has been stated that constructive trusts "never arise except where the holder of the legal title obtained it through fraud, misrepre-

sentation, concealments, undue influence, duress, or some other wrongful act whereby another is deprived of the title to his property." *Dotson v. Dotson,* 307 Ky. 106, 209 S.W.2d 852, 853 (1948). Here, the Bank did nothing wrongful to obtain the contested money. But elsewhere, the Kentucky courts have clarified that "the foundation upon which a constructive trust arises is a wrongful appropriation *or retention* of the property of another." *Panke v. Panke,* 252 S.W.2d 909, 911 (Ky.1952) (citations omitted) (emphasis added). Thus, restitution has been ordered made in Kentucky where one party has paid another too much by mistake, *Bradshaw v. Kinnaird,* 319 S.W.2d 475, 477 (Ky.1958) (stating that "[t]o leave plaintiff without remedy would not only be unjust to him but would also result in a windfall to defendants," and declaring it "immaterial whether we base the right of recovery upon a theory of quasi contract . . . or unjust enrichment") (citations omitted).

Applying these principles, we hold that it is unjust for the Bank to continue to claim the money mistakenly overpaid by L & K. Our holding is buttressed not only by the Bank's failure to show that it will suffer any prejudice by having to repay the contested money (other than the natural prejudice of losing money gained by windfall), but also by the added consideration that any prejudice it might have suffered could have been avoided had it kept careful track of its own records of Hurricane Elkhorn's transactions.

### B.

Having decided that a constructive trust should be created, our next concern is whether the trust is traceable and thus recoverable. The Bankruptcy Court held that L & K could not recover because it could not trace its funds into specific assets. It relied on *In Matter of Kennedy & Cohen, Inc.,* 612 F.2d 963 (5th Cir.), *cert. denied,* 449 U.S. 833, 101 S.Ct. 103, 66 L.Ed.2d 38 (1980); *Rosenberg v. Collins,* 624 F.2d 659 (5th Cir.1980); and 4 *Collier on Bankruptcy* ¶ 541.13 (15th ed. 1979). *See also Elliott v.*

*Bumb,* 356 F.2d 749 (9th Cir.), *cert. denied,* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966); and *In Matter of Esgro,* 645 F.2d 794, 798 (9th Cir.1981) (reaffirming *Elliott v. Bumb, supra,* and interpreting *Kennedy & Cohen, supra,* as holding that "federal bankruptcy law . . . could not be enforced to create a trust for commingled funds").

But none of these cases is controlling in our jurisdiction, and indeed, most of them are readily distinguishable. Either they do not address the question specifically before us, *see Kennedy & Cohen, supra;* or they misread applicable law, *compare Rosenberg v. Collins, supra, with In re Teltronics, Ltd.,* 649 F.2d 1236 (7th Cir.1981) (showing that the Supreme Court's treatment of tracing requirements is more subtle than *Rosenberg* recognized, and as discussed below, actually supports our result); or they involve state-created preferences deemed to conflict with federal bankruptcy law, *see Elliott v. Bumb, supra* (implicitly repudiated in any event in *Selby v. Ford Motor Co.,* 590 F.2d 642 (6th Cir.1979)).

Instead, a close reading of the tracing cases indicates that this situation is appropriately tailored for the principle long ago established in England in *Knatchbull v. Hallett,* L.R. 13 Ch.D. 696, and subsequently adopted in the United States in *National Bank v. Insurance Co.,* 104 U.S. 54, 68, 26 L.Ed. 693 (1881). *See generally Cunningham v. Brown,* 265 U.S. 1, 12–13, 44 S.Ct. 424, 426–27, 68 L.Ed. 873, 877 (1924); *In re Teltronics, Ltd.,* 649 F.2d 1236, 1240–41 & n. 4 (7th Cir.1981). Under that principle, the assets in a commingled fund are considered to be traceable to a beneficiary of a constructive trust if all similarly-situated beneficiaries are treated equally and if the fund is never entirely depleted between the time of receipt and the time when the trust is imposed. As stated in *Collier on Bankruptcy:*

> The situation frequently occurs where trust funds have been traced into a general bank account of the debtor. The following general principles have been applied. The bankruptcy court will follow the trust fund and decree restitution

where the amount of the deposit has at all times since the intermingling of funds equaled or exceeded the amount of the trust fund. But where, after the appropriation and mingling, all of the moneys are withdrawn, the equity of the cestui is lost, although moneys from other sources are subsequently deposited in the same account. In the intermediate case where the account is reduced to a smaller sum than the trust fund, the latter must be regarded as dissipated, except as to the balance, and funds subsequently added from other sources cannot be subjected to the equitable claim of the cestui que trust. If new money is deposited before the balance is reduced, the reduction should be considered to be from the new money and not from the monies held in trust.

4 *Collier on Bankruptcy* ¶ 541.13 at 541–69 (15th ed. 1979) (citations omitted); *accord, Johnson v. Morris,* 175 F.2d 65, 67 (10th Cir.1949) (terming this principle "the Federal rule").

### C.

▆ Thus at the least, the *Knatchbull v. Hallett* principle indicates that L & K is entitled to recover the lesser of $84,652.60 or the lowest amount contained in Hurricane Elkhorn's operating account between the time of L & K's mistaken overpayments and the date L & K retained the contested sum. It appears, but we cannot be sure from the record, that Hurricane Elkhorn's operating account always contained at least $84,652.60, so that L & K is assured of recovering that amount. But if the account dropped below that amount, an additional issue arises that suggests we modify the *Knatchbull v. Hallett* principle.

This additional issue is whether we should also allow L & K to dip into the Bank's general assets, if Hurricane Elkhorn's operating account ever dropped below the contested sum. Under *Knatchbull v. Hallett,* L & K would ordinarily be out of luck if Hurricane Elkhorn's account ever dropped that far. But here, we notice that in such a circumstance it will not be the debtor who avoids liability, but rather the Bank who

profits. For it will be the Bank that will have been enriched by an arrangement under which money was only transferred into Hurricane Elkhorn's operating account after its principal debt and interest fees were paid off to the Bank.

The difficulty with this potential outcome is that the Bank may not only be the party that profits, but if so, it will also have been the party that caused this outcome because it controlled where L & K's payments went. Stated differently, if we hold L & K to a recovery less than the contested $84,652.60, we will be allowing the Bank to be enriched by having itself decided to put money into its own general assets instead of adding it to Hurricane Elkhorn's operating account. Because we think this too would be unjust, we hold that L & K is entitled to recover the entire sum of $84,652.60, to be paid first in accordance with the normal operation of the *Knatchbull v. Hallett* principle, and thereafter from the Bank if necessary. (We assume that the sum of the operating account and the Bank's total assets never dipped below $84,652.60 between the time of the overpayments and the date L & K retained the monies.)

### III.

Finally, it can hardly be doubted that L & K's retention of the contested amount violated the Bankruptcy Code's automatic stay provisions, 11 U.S.C. § 362(a)(7). It may be possible for L & K to obtain relief from these stay provisions, but L & K must follow the procedures outlined by the Act, 11 U.S.C. § 362(d)–(g). We remand for the Bankruptcy Court to conduct appropriate proceedings.