**In re COMPUTER INPUT SERVICES, INC., Debtor.**

**FIRST NATIONAL BANK OF BOSTON, Plaintiff,**

v.

**COMPUTER INPUT SERVICES, INC., Defendant.**

Bankruptcy No. 83–01361K.

Adv. No. 83–1511K.

United States Bankruptcy Court, E.D. Pennsylvania.

Sept. 20, 1983.

Neal D. Colton, Karen L. Senser, Philadelphia, Pa., for defendant/debtor.

Jack B. Justice, Philadelphia, Pa., for Official Unsecured Creditors' Committee.

Marjorie O. Rendell, Philadelphia, Pa., for plaintiff.

Theodore J. Krulwich, New York City, for National Shoes, Inc.

Jerry S. Cohen, Washington, D.C., for Service Station Dealers Association of Am.

## OPINION [1]

WILLIAM A. KING, Jr., Bankruptcy Judge.

### INTRODUCTION

Computer Input Services, Inc. ("CISI") is a data processing company which filed a

---

**1.** This Opinion constitutes the findings of fact and conclusions of law required by Rule 7052 of the Rules of Bankruptcy Procedure.

voluntary Chapter 11 petition on March 31, 1983.

Prior to April 13, 1983, CISI operated a data processing service center for retail merchants who contracted with CISI to handle their VISA and Mastercard credit transactions. The operations of the so-called "credit card division" ceased on April 13, 1983, when the instant controversy arose.

At issue is the debtor's Application for Authority to Settle an Adversary Proceeding with the First National Bank of Boston ("FNBB"). FNBB is a national banking association with its principal office in Boston, Massachusetts. CISI maintains two (2) bank accounts with FNBB. One of these is the account from which FNBB made disbursements to retail merchants who had submitted charge slips to CISI for collection processing ("The charge processing account").

On April 13 and 14, 1983, FNBB made electronic disbursements from this account of $294,000.00 to various retail merchants pursuant to instructions on magnetic tapes sent by CISI to FNBB. These disbursements created an overdraft on CISI's account of $292,196.00, which FNBB now seeks to collect by means of the above-captioned adversary proceeding.

CISI applied to this Court for its approval to settle the adversary proceeding with FNBB and three (3) parties objected.

The objecting parties are: (1) National Shoes, Inc.; (2) the Service Station Dealers Association of America; and (3) the Official Unsecured Creditors' Committee.

National Shoes, Inc. and the Service Station Dealers Association of America filed official objections to CISI's Application prior to the July 7, 1983 hearing. National Shoes, Inc. is a retail merchant serviced by CISI's credit card division and holder of an unsecured post-petition claim against CISI. The Service Station Dealers Association represents seventy-seven (77) service station merchants who were serviced by CISI's credit card division and hold unsecured post-petition claims against CISI.

At the July 7, 1983 hearing on the Application, counsel for both National Shoes, Inc. and the Service Station Dealers Association of America were present. Extensive testimony was given by the debtor concerning its operations. At the conclusion of the hearing, the debtor and the two (2) objecting parties of record were ordered to submit proposed findings of fact, conclusions of law, and memoranda of law.

CISI and National Shoes, Inc. filed the above-ordered pleadings, but the Service Station Dealers Association did not; instead, the Association adopted by reference those pleadings filed by National Shoes, Inc.

The third objecting party, the Official Unsecured Creditors' Committee, voiced an objection on July 18, 1983, eleven (11) days after completion of the hearing. Counsel for the Committee sent the Court a letter stating that notice of the hearing had never been received by the Committee and attaching an unsigned copy of the Committee's objection.

The adversary docket shows that this objection was never filed by Counsel for the Committee. Hence, the objection of the Committee is not part of the official record in this adversary proceeding.

After review of the memoranda filed by the debtor and the two (2) objecting parties, the Court will grant debtor's Application and permit the above-captioned adversary proceeding between FNBB and the debtor to be settled according to the proposed terms. Before discussing the proposed settlement agreement between CISI and FNBB, however, this Court will describe the business operations of the debtor in detail to show how the $292,196.00 overdraft in CISI's account occurred.

## FACTS

All of the retail merchants utilizing CISI's services have charge slip processing contracts with CISI. These contracts are known as "Retail Merchant Agreements." National Shoes, Inc. has such an "Agreement" with CISI, as do the various service

station dealers represented by the Service Station Dealers Association of America.

A typical charge card transaction was processed by CISI in the following manner: (1) An individual purchaser used Mastercard or VISA to purchase goods or services from a retail merchant;[2] (2) the merchant forwarded the tissue charge slips to CISI for collection processing;[3] (3) CISI keypunched the information from the slips onto magnetic computer tapes;[4] (4) CISI telephonically transmitted the information recorded on the magnetic tape to First National Bank of Louisville ("Louisville") at about 1:00 P.M. each business day;[5] (5) on the same day, Louisville credited CISI's account for the gross amount of the recorded purchases and wire-transferred funds for that amount to FNBB, net of

(a) Louisville's processing fee of 1.7 percent (1.7%);

(b) chargebacks to CISI's account at Louisville for disputed credit charges and

(c) keypunch errors.[6]

Also on the same day, CISI sent FNBB a copy of the magnetic tape with instructions that, after three (3) days, FNBB should disburse the funds from CISI's account to those retail merchants involved in the recorded transactions.[7]

Testimony from the July 7th hearing showed that funds wired to FNBB from Louisville were traceable to each individual transaction recorded on the magnetic tape.[8]

FNBB used the New England Automated Clearing House Association ("NEACH") to disburse money to the retail merchants. The disbursement process through NEACH took three (3) days. On the first day, NEACH credited money received from CISI's account at Louisville to CISI's account at FNBB. On the second day, NEACH received, by electronic transmission, the credit information which it needed for the following day's disbursements. On the third day, NEACH disbursed money to the appropriate retail merchants and then electronically debited CISI's FNBB account for the same amount.[9]

CISI's decision to discontinue the operations of its credit card division, and the ensuing events which occurred on April 13, 1983, came about as a result of recommendations made by an outside consultant. The consultant reported to CISI that the division was suffering losses and that its operations should be discontinued as soon as possible.[10] He also informed CISI that there were insufficient funds to cover the credit card charge slips which had been submitted to CISI for processing.[11] Based on this information, CISI discontinued the credit card division's operations on April 13, 1983.

CISI immediately sent mailgrams to all retail merchants with whom it had processing contracts stating that the credit card division was discontinued, effective as of the close of business on April 12, 1983, and that VISA and Mastercard charge slips would no longer be processed.[12]

Also on April 13, 1983, CISI gave FNBB instructions to transfer $278,000.00 from CISI's account to the Hamilton Bank. CISI did so because it feared FNBB's seizure of these funds, if they were still in the FNBB account once FNBB learned of the closing down of CISI's credit card operations. After the $278,000.00 withdrawal, CISI's balance in its FNBB charge processing account

---

2. N.T., p. 6.

3. N.T., p. 7.

4. N.T., p. 7.

5. N.T., p. 7.

6. N.T., p. 7, 9–10, 13.

7. N.T., p. 8.

8. N.T., p. 8, 24–26.

9. FNBB Adversary Complaint, No. 83–1511K, p. 10.

10. N.T., pp. 13–14.

11. N.T., p. 15.

12. N.T., p. 15.

was less than $2,000.00.[13] The $278,000.00 was placed in an interest bearing account at Hamilton Bank and has remained there, pending this Court's determination of the proper disbursement of these funds.

At the same time that the funds were being withdrawn from FNBB, FNBB was making electronic disbursements to retail merchants through NEACH. Approximately $294,000.00 was paid out by FNBB in this manner on April 13 and 14, 1983, pursuant to instructions on the magnetic tapes sent to FNBB by CISI on April 8 and 11, 1983. These disbursements resulted in an overdraft on CISI's account of $292,196.00.[14]

FNBB learned of the overdraft in CISI's account on April 19, 1983. FNBB was able to intercept some of the payments to retail merchants. FNBB seized $90,525.92 of the $294,000.00 in the process of being transmitted to the merchants.[15] This sum is still being held by FNBB.

FNBB also demanded that CISI return the $278,000.00 which had been transferred to Hamilton Bank the day before. CISI, however, refused to return any of this money to FNBB without Court approval.

On June 8, 1983, FNBB filed the instant adversary proceeding against CISI to recover the $278,000.00 and any balance due FNBB which was not covered by the $278,000.00. FNBB also seeks punitive damages and attorney's fees from CISI on account of CISI's actions.

After negotiations, CISI and FNBB agreed to settle the adversary proceeding according to the following terms:

(1) The $278,000.00 plus interest, currently in CISI's account at Hamilton Bank, will be transferred to FNBB and applied against the overdraft;

(2) FNBB will pay those retail merchants whose payments were intercepted by

FNBB the amount of the funds seized ($90,525.92);

(3) FNBB will offset the balance of the overdraft against monies in the second CISI account at FNBB:

(4) the remainder of the balance in CISI's second FNBB account, including interest thereon, will be returned to CISI and deposited in a special account at Hamilton Bank pending distribution to retail merchants and

(5) FNBB will release all claims against CISI regarding the transfer of the $278,000.00 to Hamilton Bank, and the overdraft.

## DISCUSSION

Essentially the Court has before it two (2) objections. However, since the Service Station Dealers Association chose to adopt the findings of fact, conclusions of law, and memorandum submitted by National Shoes, Inc., the Court will treat the objecting parties as one.

All parties, including the Official Unsecured Creditors' Committee, take the position that the post-petition unsecured claim of FNBB is not entitled to priority treatment over the claims of other creditors. National Shoes, Inc. argues that the claims of both FNBB and National Shoes are administrative expenses under Section 503 of the Code and therefore, they are of equal rank and priority.[16]

National Shoes, Inc. and the Service Station Dealers ("the objectors") vigorously oppose CISI's use of the funds in the Hamilton Bank ($278,000.00) to settle the adversary proceeding with FNBB. The objectors also oppose payment of the intercepted funds ($90,525.92) to those retail merchants who were supposed to receive these funds prior to their interception by FNBB on April 14, 1983.[17]

13. N.T., pp. 15–17, 35–36.

14. FNBB Complaint, Adversary No. 83–1511K, pp. 22–23, FNBB Application for Authority to Settle Adversary Proceeding, p. 8.

15. N.T., pp. 17–19.

16. See National Shoes, Inc. Memorandum of Law, Legal Document No. 16, p. 15.

17. See Memorandum of Law of National Shoes, Inc., Legal Document No. 16, p. 10.

The parties agree that the funds ($278,-000.00) in the Hamilton Bank are not property of the debtor's estate, and that the Court should impose a constructive trust on these funds. However, the parties differ on the issue of who is the rightful beneficiary of the trust funds.

## THE ARGUMENT OF NATIONAL SHOES, INC. AND THE SERVICE STATION DEALERS

The essence of the objectors' legal argument is (1) that a constructive trust should be imposed on the funds being held by both the Hamilton Bank ($278,000.00) and FNBB ($90,525.92); and (2) the beneficiaries of these trust funds should be all retail merchant claimants. To support these conclusions, the objectors point to the fact that Louisville treated all monies transferred to FNBB as fungible. Louisville made chargebacks against "whatever monies it had on hand irrespective of the particular transactions or merchandise from which such chargebacks resulted."[18] Thus, in the opinion of the objectors, the funds transferred by Louisville to FNBB on any given day were not specifically identified or earmarked to go to any individual merchant.

Instead, Louisville "treated all monies held by it as being in one large pool subject to chargebacks unrelated to the particular Bank Card merchant whose funds had been collected by Louisville."[19]

## THE ARGUMENT OF CISI

CISI argues that (1) a constructive trust has been created, (2) FNBB is the rightful beneficiary of the $278,000.00, and (3) the settlement with FNBB should be approved because CISI was unjustly enriched by FNBB's mistaken disbursement of $294,-000.00 from bank funds on April 13 and 14, 1984.

Unknown to FNBB, the balance in CISI's account at the time the disbursements were made was less than $2,000.00. By following the instructions on the magnetic tapes, FNBB paid out $294,000.00 of its own money to specified merchants, erroneously believing that CISI's account contained sufficient funds to cover the disbursements.

The factual statements made by the objectors concerning the traceability of funds to individual merchants are strongly disputed by CISI. CISI offers the testimony given at the July 7, 1983 hearing as proof that the funds were traceable,[20] in direct contradiction to the objectors' assertions that chargebacks by Louisville caused these funds to become untraceable.

CISI also challenges National Shoe's contention that it had an interest in the funds ultimately disbursed by FNBB on the dates in question. In a Reply Memorandum, filed September 7, 1983, CISI gives persuasive evidence of the traceable nature of the funds:

"The money sent to FNBB by Louisville on the final days of transmission was tagged several days earlier to go to the specific merchants to whom FNBB made its distribution of $294,000. A list of the merchants appearing on the tape is attached hereto as Exhibit A, and it shows that National's name was not among them. Because FNBB was instructed to make disbursements only to the particular merchants listed on that tape, National was not paid. This was not sheer chance.

The payment system was designed to ensure that specific dollars went to specific merchants whose names appeared on specific tapes. (footnote omitted) Therefore, National has no claim to that $294,-000. which Louisville forwarded to the other merchants whose names appear on Exhibit A hereto."[21]

■ This Court has reviewed the events which took place on April 13 and 14, 1983 and the legal arguments posed by counsel for both sides, and concludes that FNBB is

18. *Id.,* p. 9.

19. *Id.,* p. 10.

20. N.T., pp. 24–26.

21. Reply Memorandum of CISI, Legal Document No. 23, p. 7.

the rightful beneficiary of the $278,000.00 currently being held in CISI's account at Hamilton Bank. Furthermore, the merchants whose payments were intercepted by FNBB on April 14, 1983 should rightfully receive those payments now, pursuant to the proposed settlement agreement between CISI and FNBB.

Under Pennsylvania law,[22] a constructive trust arises:

"... where a person who holds title to property is subject to an equitable duty to convey it to another on the ground that he would be unjustly enriched if he were permitted to retain it ... 5 Scott, Trusts § 462 at 3413 (3d ed. 1967)... Although it is not stated clearly in every opinion, one necessary aspect of the defendant's holding title to property is that he must have acquired it in some way that creates the equitable duty in favor of the plaintiff."

*In re Cubbler,* 17 B.R. 674, 676 (Bkrtcy.E.D. Pa.1982) citing *Pierro v. Pierro,* 438 Pa. 119, 127, 264 A.2d 692 (1970) (footnote omitted).

"... Generally, a constructive trust arises whenever the courts find it necessary to meet the demands of justice, morality, conscience and fair dealing."

*In re Cubbler, supra* 17 B.R. at 677, citing *Buchanan v. Brentwood F.S. & L. Assoc.,* 457 Pa. 135, 151, 320 A.2d 117 (1974).

"... A constructive trust may arise solely because the defendant will be unjustly enriched, regardless of whether the plaintiff has proven fraud, accident, mistake or undue influence."

*In re Cubbler, supra* 17 B.R. at 677, citing *Kohr v. Kohr,* 271 Pa.Super. 321, 328–29, 413 A.2d 687 (1979) and *Reiff v. Hall,* 35 D. & D.2d 661, 664 (1964).

The key element of a constructive trust, unjust enrichment, is present in the instant factual situation. CISI was unjustly enriched to the immediate detriment of FNBB. The only equitable solution is to permit the return of the $278,000.00 to FNBB.

Contrary to National Shoe's assertion that the overdraft paid by FNBB on CISI's account was "nothing more than a loan by FNBB to the debtor",[23] FNBB never intended to make any kind of a loan to CISI. Therefore, a debtor-creditor relationship was not established between CISI and FNBB.

As a direct result of CISI's removal of $278,000.00 from its FNBB account on April 13, 1983, CISI received a windfall that should not be viewed as property of the estate for distribution to creditors. This windfall occurred because of FNBB's disbursements from its own money on April 14, 1983. Even though FNBB was able to recoup $90,525.92 of the $294,000.00 disbursed, CISI still received a windfall of over $200,000.00 from money belonging to another.

To now require FNBB to await a pro rata distribution from property of the estate would be inequitable and unjust. The objectors do not have an interest in the money paid by FNBB from its own funds. In order to enable CISI to make restitution to FNBB at the earliest opportunity, the equitable remedy is to allow CISI to return the $278,000.00, which it removed from its FNBB account on April 13, 1983, to FNBB.

■ By imposing a constructive trust for the benefit of FNBB on the funds held by Hamilton Bank, this Court views FNBB as the rightful owner of the funds in the constructive trust. This result will not effectuate a preferential treatment of one unsecured creditor over another because it is an established principle of law that a beneficiary under a constructive trust may be preferred over other unsecured creditors. *In re Wyatt,* 6 B.R. 947 (Bkrtcy.E.D.N.Y. 1980). The reasoning behind this rule is simple:

---

**22.** National Shoes, Inc.'s Memorandum, Legal Document No. 16, p. 10 states that Pennsylvania law governs because the Retail Merchants Agreements between CISI and the individual merchants so provide.

**23.** Reply Memorandum of National Shoes, Inc., Legal Document No. 21, p. 3.

"Under the Bankruptcy Act, property held by the bankrupt in trust belongs to the beneficiary and never becomes a part of the bankruptcy estate. . . ."

*Id.,* at 952.

The result is the same under the Bankruptcy Code:

"[W]here the debtor holds bare legal title to property without any equitable interest, or holds property in trust for another, only those rights which the debtor would have otherwise had emanating from such interest pass to the estate under § 541. . . ."

*Id.,* at 953.

Similarly, the $90,525.92 seized by FNBB on April 14, 1983 is not the property of FNBB or the debtor's estate. That money rightfully belongs to those merchants who were earmarked to receive the funds, according to the charge slips submitted to CISI on April 8 and 11, 1983.

In conclusion, this Court approves the proposed settlement agreement between CISI and FNBB, over the objections of National Shoes, Inc. and the Service Station Dealers and believes that the agreement represents a fair and equitable resolution of Adversary Proceeding No. 83–1511K.