**In re MAHAN & ROWSEY, INC., Debtor.**

**Dan B. TURLEY, Plaintiff,**

v.

**MAHAN & ROWSEY, INC., Defendant.**

**Bankruptcy No. 82–01390.
Adv. No. 83–0028.**

United States Bankruptcy Court, W.D. Oklahoma.

Dec. 19, 1983.

Paul Tobin of Cohen & Pluess, Oklahoma City, Okl., for Mahan & Rowsey, Inc.

Dan T. Foley of Kirk & Chaney, Oklahoma City, Okl., for Dan B. Turley.

## MEMORANDUM DECISION AND ORDER

ROBERT L. BERRY, Bankruptcy Judge.

This matter concerns the overpayment of certain joint interest billings by the plaintiff, Dan B. Turley (hereinafter "Turley"), to the defendant, Mahan & Rowsey, Inc. (hereinafter "M & R"). The parties have stipulated to the following facts:

1. Turley is a joint participant in the Rushing # 1–10 well.

2. M & R is an Oklahoma oil and gas corporation which filed its Chapter 11 petition in the United States Bankruptcy Court for the Western District of Oklahoma on July 26, 1982. M & R has continued as debtor in possession since its filing for relief. M & R is the operator and a joint participant of the Rushing # 1–10 well.

3. On or about February 25, 1982, M & R proposed and offered to Turley the opportunity to participate in the drilling and completing of the Rushing # 1–10 well. Turley elected to participate and informed M & R of such.

4. On March 12, 1982, M & R requested that Turley remit as the dry hole cost the sum of $28,706.45, this amount reflecting his percentage of ownership (2.35294%). On March 22, 1982, such an amount was forwarded to M & R. On March 26, 1982, said funds were deposited in M & R's checking account at Liberty National Bank and Trust Company of Oklahoma City, Account No. 012 7841 (hereinafter the "Liberty Account").

5. On March 26, 1982, Turley received from M & R a "Joint Interest Invoice" dated March 1, 1982, requesting payment of $11,714.41. On April 2, 1982, such an amount was forwarded to M & R. On April 20, 1982, said funds were deposited in the former Penn Square Bank, N.A., Checking Account No. 10–9971 (hereinafter the "B.F. Leasing Account").

6. On April 7, 1982, M & R sent Turley a letter requesting payment for completion costs. Turley's alleged amount owing was $15,908.94. Turley, on April 27, 1982, forwarded such an amount to M & R. On April 30, 1982, said funds were deposited in the Liberty Account.

7. On June 18, 1982, Turley received another "Joint Interest Invoice", this one dated April 30, 1982, stating that Turley owed $16,433.29. Turley, on June 24, 1982, forwarded payment in this amount. On July 2, 1982, said funds were deposited in the Liberty Account.

8. On October 6, 1982, Turley received a letter from M & R requesting $2,700.00 for remedial work on the well. These funds were furnished by Turley to M & R on November 8, 1982. Said funds were deposited in the escrow account for the Rushing # 1–10 which was a set up for remedial work on the well after M & R filed for bankruptcy relief, pursuant to order of this Court.

9. Turley paid M & R $75,463.09 pursuant to its requests. All payments were made by Turley to M & R by check. M & R deposited all checks in the accounts specified; the checks were forwarded to Turley's bank and subsequently honored.

10. Turley, by his inadvertence and excusable neglect, or by the mismanagement, lax bookkeeping, or negligence of M & R in sending demand letters and joint interest invoices, paid to M & R in response to its requests $42,082.65 over the proper amount actually owing, which was $33,380.44.

11. Turley has requested the turnover of the funds received by M & R which are in excess of amounts properly owing, and M & R has failed and refused to comply with said request for turnover.

12. The Liberty Account's two lowest intervening balances after the last payment by Turley was deposited, and before the petition for bankruptcy was filed, were respectively:

July 26, 1982 — $6,190.32

July 13, 1982 —     726.14

The July 13th balance was reached after Liberty Bank's deduction of $11,223.06 from the Liberty Account on July 13, 1982. This deduction arose out of a deposit, credited on July 7, 1982, in the amount of $11,223.06, of

a check from AnSon Transportation drawn on AnSon's Penn Square Bank Account. The Federal Deposit Insurance Corporation, appointed Receiver of the Penn Square Bank on July 7, 1982, subsequently dishonored all checks drawn on AnSon's Penn Square Account. AnSon replaced all checks so dishonored, including the one previously deposited to the debtor's account on July 7, 1982. AnSon's substitute check was deposited on July 14, 1982.

13. The B.F. Leasing Account's lowest intervening amount, after the payment of Turley was made, occurred on June 3, 1982, and was $4,936.39. The account balance increased and on November 2, 1982, $21,669.14 was turned over to the debtor in possession.

14. M & R presently has more than $42,082.65 in its general operating account. This account was the receiving account for both the Liberty and B.F. Leasing Accounts. There are presently over $25 million in recorded claims against the debtor estate.

15. As of this date, M & R is unaware of any amount owing by Turley to M & R. Audits are being conducted on the other wells in which Turley is a participant; however, M & R acknowledges that the payments sent by Turley expressly stated that they were to be applied to the amount owing on the Rushing # 1–10 well.

16. As of this date, the amount of funds in M & R's general operating account has never decreased lower than the amount of funds which were in M & R's accounts as of the date on which M & R filed for bankruptcy relief. Specifically, the general operating account from July 26, 1982, through November 2, 1982, at all times exceeded $6,190.32, and after November 2, 1982, always exceeded $11,126.71.

Both parties have moved for summary judgment pursuant to Rule 756 Fed.R. Bankr.P.[1] and Rule 56 Fed.R.Civ.P., urging that there exists no issue of material fact regarding the overpayments. "If no such issue exists, the rule [Rule 56 Fed.R.Civ.P.] permits the immediate entry of judgment." 10A Wright, Miller and Kane, *Federal Practice and Procedure,* § 2725, at 76–77 (1983) (citations omitted).

In support of their motions, Turley and M & R argue opposite sides of the same propositions. Turley posits that the parties entered into a joint venture; M & R denies the existence of such an enterprise. Turley argues that he is entitled to the imposition of a constructive trust; M & R counters that a constructive trust may be imposed only when the funds that are the subject of the trust can be traced and that in the instant case such is not possible. Turley argues that the relationship between M & R and Turley is one of a fiduciary—beneficiary; M & R argues the relationship is in the nature of a debtor—unsecured creditor.

The parties submitted extensive briefs and the matter was taken under advisement.

■ We will address first the question of whether or not the parties were engaged in a joint venture. Should we find that such an arrangement existed between the parties, it is well recognized that a "[j]oint adventurer occupies a fiduciary position with respect to the other members and owes a higher and greater duty to them than he owes to one with whom he deals at arms length." *Oklahoma Company v. O'Neil,* 440 P.2d 978, 984 (Okl.1968).

■ The requirements for determining whether a business relationship between two or more persons constitutes a joint adventure are that there must be a joint interest in the particular property or project involved; an agreement, either expressed or implied, to share in the profits and losses; and acts or conduct reflecting cooperation in the project. *Oklahoma Company v. O'Neil, supra.* Furthermore, "[i]ts existence must be proven as any other fact." *Feagin v. Champion,* 195 Okl. 116, 117, 155 P.2d 518, 520 (1944).

1. These motions were filed prior to August 1, 1983, the effective date of the new Bankruptcy Rules of Procedure.

■ We take judicial notice that the operating agreement executed by the parties herein explicitly provides that "[i]t is not the intention of the parties to create, nor shall this agreement be construed as creating, a mining or other partnership or association . . . ." Article VII of the Operating Agreement. Similar language was found in the memorandum of agreement executed by the parties in *Oklahoma Company v. O'Neil, supra.* In that case, a group of individuals had agreed to jointly purchase several oil leases. The plaintiff in *Oklahoma,* who was the packager of this enterprise, had sought to enforce certain liens against the other purchasers. These purchasers cross-petitioned, requesting recission of the agreement, alleging fraud. Disregarding language similar to that hereinabove quoted, the Oklahoma Supreme Court found that there did indeed exist facts sufficient for a finding that a joint venture existed between the parties; that the plaintiff therefore occupied a fiduciary position with respect to the defendants. Mindful of the fact that this matter is before us on motions for summary judgment, we are of the opinion that as to the existence of a joint venture, there does exist issues of material fact and therefore deciding such a question in a summary disposition would be improper. We believe we may nonetheless dispose of the matter on other grounds and therefore next address the issue of imposition of a constructive trust.

■ In a bankruptcy context, questions of fiduciary relationships vis-a-vis trusts most frequently occur regarding issues of dischargeability pursuant to 11 U.S.C. § 523(a)(4)[2]. The fiduciary capacity referred to in § 523(a)(4) has been held to be limited to express and technical trusts. *Davis v. Aetna Acceptance Co.,* 293 U.S. 328, 55 S.Ct. 151, 79 L.Ed. 393 (1934); *In re Romero,* 535 F.2d 618 (10th Cir.1976); *In re Niven,* 32 B.R. 354 (Bkrtcy.W.D.Okl.1983). However, in certain circumstances, bankruptcy courts have imposed constructive trusts. *Eg., In re Hurricane Elkhorn Coal Corp., II,* 32 B.R. 737 (D.C.W.D.Ky.1983); *In re Computer Input Service, Inc.,* 33 B.R. 292 (Bkrtcy.E.D.Pa.1983); *Matter of U.S.N. Co., Inc.,* 32 B.R. 675 (Bkrtcy.S.D.N.Y.1983). What becomes abundantly clear from a reading of these bankruptcy cases is that the imposition of a constructive trust is to be determined by state law. *See Jaffke v. Dunham,* 352 U.S. 280, 77 S.Ct. 307, 1 L.Ed.2d 314 (1957).

■ In Oklahoma the primary reason for imposing a constructive trust is to avoid unjust enrichment. *Easterling v. Ferris,* 651 P.2d 677 (Okl.1982). It will be imposed against one whom

> [b]y fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either has obtained or holds the legal right to property to which he ought not, in equity and good conscience, hold and enjoy.

*Cacy v. Cacy,* 619 P.2d 200, 202 (Okl.1980) (citation omitted). "[A]n element of unfairness in allowing the legal title holder to retain the property is not sufficient to justify the imposition of a constructive trust." *Easterling v. Ferris, supra,* at 680.

■ In attempting to establish the existence of a constructive trust the evidence adduced must be clear, unequivocal and decisive beyond a reasonable doubt. A mere preponderance of the evidence is not sufficient to establish a constructive trust rather it must be established by evidence which is clear, definite, unequivocal and satisfactory, or such as to leave but one conclusion, or as to leave no reasonable doubt as to the existence of the trust. *Easterling v. Ferris, supra; Cacy v. Cacy, supra; Johnson v. Rowe,* 185 Okl. 60, 89 P.2d 955 (1939).

. . . .

**2.** Title 11 U.S.C. § 523 provides in pertinent part:

(a) A discharge under section 727, 1141, or 1328(h) of this title does not discharge an individual debtor from any debt—

(4) for fraud or defalcation while acting in a fiduciary capacity . . .

Addressing the issue of fraud, Turley has not alleged that M & R committed a fraud nor could he have alleged so. While the actions of M & R demonstrate a laxity in accounting procedures, they do not constitute fraudulent conduct. The record simply fails to establish egregious conduct on the part of M & R.

Finding an absence of fraud, we normally should consider if whether under the circumstances it is against equity that the overpayment should be retained by M & R. However, we need not consider if the facts at bar militate toward the imposition of a constructive trust as we believe the proper resolution of this matter lies with the finding of a fiduciary-beneficiary relationship.

The question of the relationship existing between an operator and non-operator owners was recently discussed in *Reserve Oil, Inc. v. Dixon,* 711 F.2d 951 (10th Cir.1983). Construing an operating agreement containing language substantially similar to the one in the instant case, the Tenth Circuit held that "[t]his contract created a trustee type relationship imposing a duty of fair dealing between the operator and the non-operator owners in the matter of distribution of shares among the owners. We do not mean to imply that there is a general agency relationship as to third parties, ..." *Id.* at 953.

We believe *Reserve* is dispositive of the matter at bar, hence a brief summary of its facts is appropriate.

Reserve Oil owned a working interest in a certain oil and gas well. Pengo was the operator of this well and Dixon was an officer of Pengo. Reserve had alleged that Pengo sold the well's production in which Reserve had an interest and failed to turn over to Reserve its share of the proceeds of sale. Instead, Pengo used the money to pay operating expenses and the ownership shares of the other owners of interests in the well, including Dixon. Based on such facts, the Circuit Court found a "trustee type" of relationship.

■ As there exists a "trustee type of relationship imposing a duty of fair dealing

between the operator and the non-operator owners" in the distribution of shares (on which are based the percentage of the profits from the operation), this Court is hard pressed to find why we should not extrapolate such a ruling to include in it a co-equal duty of fair dealing in the matter of collection of non-operator owners' percentage of well costs (which, hopefully, make the profits possible).

Accordingly, we find that as between M & R and Turley there existed a trustee type relationship which imposed upon M & R a duty of fair dealing with respect to the charges which M & R billed to Turley; that any overpayments made by Turley are held for him in trust by M & R.

The final matter we need discuss is whether Turley is entitled to the entire $42,082.65.

■ M & R argues strongly that as these funds cannot be traced, they are not succeptible to the imposition of a trust. We disagree. Sufficient proof to trace trust funds is demonstrated where, as here, the beneficiary shows the particular fund or mass into which the trust money has gone, as for example, the individual bank account of the trustee. *See Boroughs v. Whitley,* 363 P.2d 150 (Okl.1961); *Ayers v. Fay,* 187 Okl. 230, 102 P.2d 156 (1940).

■ M & R next posits that, at best, Turley has traced merely the sum of $4,936.39, this amount being the lowest intermediate balance between the last payment made by Turley and the deposit of the B.F. Leasing funds to M & R as debtor in possession. Where a trustee has commingled trust funds with his own, the beneficiary may recover to the extent of the trust fund, the lowest balance to which the mass has been depleted, on the theory the trustee is presumed to have used his own funds first. *Ayers v. Fay, supra.* "[W]here the balance on hand does not equal the trust fund, such balance will all be turned over to the beneficiary." *Maynard v. Central Nat. Bank of Okmulgee,* 185 Okl. 272, 274, 91 P.2d 653, 656 (1939).

Both parties have extensively addressed the issues revolving around the determination of the lowest balance of the Liberty and B.P. Leasing Accounts, apparently in the belief that the lowest balances, prior to the filing of bankruptcy, are controlling as the amount to be imposed as a trust for Turley. While the filing date of bankruptcy is crucial for some purposes, for example preferences, we do not believe that the filing date has any mystical applicability at bar. It has been stipulated that M & R presently has more than $42,082.65 in its general operating account. This account was the receiving account for both the Liberty and B.F. Leasing Accounts. This general operating account has increased in amount subsequent to the filing of bankruptcy. Where a trustee commingles his beneficiary's money with his own, and then invades the common store, he will be presumed to have used his own money first—the law presumes that he does right rather than wrong. *Kansas Flour Mills Co. v. New State Bank,* 124 Okl. 185, 256 P. 43 (1926). The converse should therefore be true. When a trustee replenishes a commingled account which has fallen below the amount held in trust due to the trustee's invasion, the trustee is presumed to return the beneficiary's money first. The fact that M & R is now a debtor in possession should not alter the trust relationship. The relationship follows and attaches through the bankruptcy proceeding.

Accordingly, for the reasons outlined above we conclude that Turley is entitled to the entire $42,082.65 overpayment, which sum comprises the trust of which Turley is the beneficiary. Therefore, the motion of Turley for summary judgment shall be and hereby, granted. The motion of M & R for summary judgment is denied.

This decision constitutes the findings of fact and conclusions of law required by B.R. 7052.

Judgment will be entered separately.