**In re DELTA SMELTING & REFINING ALASKA, INC., fka Delta Smelting & Refining, Inc., Debtor.**

**Bankruptcy No. 4–83–00034.**

United States Bankruptcy Court, D. Alaska.

Oct. 18, 1985.

Millard F. Ingraham, Anchorage, Alaska, for Jeannette James, trustee of Delta Smelting & Refining Alaska, Inc.

Daniel R. Cooper, Jr., Fairbanks, Alaska, for Pannell, Kerr, Forster, Inc., successor in interest to Campbell Sharp, Ltd., trustee of Delta Smelting & Refining Co., Ltd., and Delta Refining Corp.

Charles D. Silvey, Schaible, Staley, DeLisio & Cook, Inc., Fairbanks, Alaska, for Richard Wilmarth and Larry Wilmarth.

## OPINION

J. DOUGLAS WILLIAMS, II, Bankruptcy Judge.

■ This matter is before the court on objections to three claims.[1] Claimant Rich-

---

1. Bankruptcy Rule 7001 provides that the adversary proceeding rules contained in part VII of the Bankruptcy Rules govern the obtaining of equitable relief and the subordination of any allowed claim or interest, except when subordination is provided in a Chapter 9, 11, or 13 plan.

The trustee commenced the instant matter by the filing of objections to claims. No one has raised any objection to the procedure used, although the parties would be well advised to follow the applicable rules in the future so that

ard Wilmarth claims a priority based upon the fact that he delivered a number of gold miner's bars to the debtor to be refined and the debtor failed to return the bars. For the reasons set forth hereinafter, Richard Wilmarth is found to be a general unsecured creditor of the debtor except as to the $900.00 priority allowed by the trustee. Larry Wilmarth was given the opportunity to brief his claim to a priority, and having failed to do so is deemed to have waived his claim to priority status, except as to the $900.00 allowed by the trustee.

The third claim is that of Delta Smelting & Refining Co., Ltd. of Richmond, British Columbia, Canada (Delta B.C.). Delta B.C. is a subsidiary of Delta Refining Corporation also of Richmond, British Columbia, Canada (Delta Canada). The debtor Delta Smelting & Refining Alaska, Inc. (Delta Alaska) is an Alaska corporation which is also a subsidiary of Delta Canada. The two Canadian corporations are in bankruptcy in Canada and the debtor is in a Chapter 7 bankruptcy in Alaska. By virtue of intercompany transactions, Delta Alaska is substantially indebted to Delta B.C. The trustee and a creditor seek to disallow or subordinate the debt claimed by Delta B.C. For the reasons hereinafter set forth the claim of Delta B.C. will not be subordinated except to the extent of the amount of Richard Wilmarth's claim.

### FACTS

The debtor (Delta Alaska) engaged in the selling, smelting, and assaying of precious metals and also served as a purchasing agent for Delta Smelting & Refining Co., Ltd., of Richmond, British Columbia (Delta B.C.). Delta Refining Corporation (Delta Canada) owns 100% of the stock of Delta Alaska and Delta B.C. Delta Canada had its headquarters in Richmond, British Columbia. Originally Delta Canada did business in Alaska without a subsidiary corporation. On April 4, 1980, Delta Canada incorporated its Alaska operation under the name Delta Smelting & Refining, Inc., with an initial capitalization of $10,000.00. The

name was changed on July 16, 1981 to Delta Smelting and Refining Alaska, Inc. to avoid confusion with the name of a California subsidiary of Delta Canada. All Delta companies had the same officers and directors. Delta Alaska (the debtor) and Delta B.C. engaged in various metal transactions with each other. As noted above, they are both subsidiaries of Delta Canada.

In an exhibit providing an introduction to the Delta companies, the corporate policy is set forth as follows:

> Delta's corporate philosophy is to deal honestly and conscientiously with every customer—no matter how small; to provide clearly written statements concerning the company's metal purchasing, assaying, pricing and payment policies.

The corporate policy is accompanied by testimonials of satisfied customers. During the silver crash of 1980 the Delta companies remained open and honored their agreements when other major North American refiners were temporarily closed. The 1980 report of the Delta companies points out they met all of their commitments to purchase precious metals during the crash in silver prices in 1980, even though it meant taking a loss of $689,000.00 during the first quarter of the year.

Delta Canada maintained absolute control over the operations of Delta Alaska. Delta Alaska issued receipts to miners for their gold using the Delta Alaska name on the receipts. The accounting department for Delta Canada and its subsidiaries, Delta B.C. and Delta Alaska, was maintained in Richmond, British Columbia. Every sale of Delta Alaska was telexed to Richmond, as well as every deposit. Delta Canada advanced funds as needed to Delta Alaska. The $10,000.00 initial capitalization of Delta Alaska was not sufficient operating capital. Delta Alaska researched the possibility of obtaining state financing, but had no independent line of credit aside from what it received from Delta Canada and Delta B.C. Although the accounting office was in Richmond, B.C., financial documents and

the issues may be more readily clarified and resolved.

payments were prepared by Delta Alaska at its Fairbanks, Alaska, office. The Delta Alaska employees were hired and fired by its Alaska manager with the exception of its chief smelter and an assayer who were transferred from Richmond, B.C.

The basic function of Delta Alaska was to purchase placer gold from Alaska miners as an agent for Delta B.C. The miners were advised that the purchases were being made on behalf of Delta B.C. Although the operations of Delta Alaska were controlled by its parent, Delta Canada, the Alaska manager of Delta Alaska oversaw the daily operations. The president of Delta Canada would make an annual visit to Alaska, usually in conjunction with a miners' conference.

Delta Alaska maintained only a small inventory of precious metals. Most gold and silver bullion of Delta Alaska was shipped to it by Delta B.C. Over a period of a few years Delta Alaska became increasingly indebted to Delta B.C. Basically the indebtedness arose from three types of transactions: (1) Delta B.C. would make overpayments for metals purchased; (2) Delta B.C. would deliver metal to Delta Alaska for which no payments were received; and (3) Delta B.C. would advance funds when the miners brought gold to Delta Alaska and occasionally too much would be advanced. Detailed journal vouchers and ledgers were maintained as to the transactions between Delta B.C. and Delta Alaska. Over the few years of operation Delta Alaska became indebted to Delta B.C. for $1,750,141.25, but was entitled to offsets of $637,240.95, leaving a balance due Delta B.C. of $1,112,900.30.

Both the Canadian and Alaska companies lost substantial sums of money in their operations, with the losses of Delta B.C. being even greater than Delta Alaska. The following table compiled from the income statements sets forth the relative sales volumes and losses of Delta Canada, Delta B.C. and Delta Alaska in 1981 and 1982:

| | 1981 | 1982 |
|---|---|---|
| Delta Canada | | |
| Sales (consolidated) | $72,156,611 | $41,796,315 |
| Loss (consolidated) | 782,320 | 5,704,598 |
| Delta B.C. | | |
| Sales | 70,584,879 | 40,805,214 |
| Loss | 242,650 | 4,315,534 |
| Delta Alaska | | |
| Sales | 1,212,961 | 587,292 |
| Loss | 284,745 | 438,711 |

As a result of the losses, Delta Canada and its subsidiary Delta B.C. filed for bankruptcy in Canada and Campbell Sharp, Ltd.[2] was appointed as trustee of both the parent and the subsidiary. Delta Alaska filed a Chapter 7 bankruptcy petition in the District of Alaska on May 12, 1983 and Jeannette James was appointed as the trustee. The inventory of Delta Alaska's trustee reflects assets of approximately $400,000.00, consisting primarily of real estate and smelting equipment.

The trustee of Delta B.C. has filed a bankruptcy claim against the debtor Delta Alaska for the $1,112,900.30 [3] net amount due Delta B.C. as a result of the intercompany transactions. The trustee of Delta Alaska has objected to the allowance of Delta B.C.'s claim, but has withdrawn her objections as to the form and timeliness of the claim. The Canadian trustee did not file a claim for the $81,065.82 scheduled debt due Delta Canada from Delta Alaska, and does not assert any right to recover on behalf of Delta Canada.

The principals of the companies did not believe that Delta Alaska had any metal depositor claims and thus never attempted to distinguish their inventory. Delta Alaska's bankruptcy schedules list approximately $7,400.00 in priority debts, $97,000.00 in secured debts, and $1,300,000.00 in general unsecured debts. The general unsecured debts are for trade accounts payable, undelivered bullion and metal, and intercompany accounts of Delta Canada

---

2. An individual was actually the licensed trustee at Campbell Sharp. Pannell Kerr Forster, Inc. has become the successor in interest to Campbell Sharp since the commencement of the proceedings.

3. The claim was actually filed in the amount of $1,222,467.00, but was adjusted at the hearing to $1,112,900.30.

and Delta B.C. The claims filed in the Delta Alaska bankruptcy are similar to the debts scheduled with a few notable exceptions: the filed claim of Delta B.C. as adjusted is approximately $29,000.00 less than the scheduled amount; Larry Wilmarth has filed a claim for $38,557.48 for gold placed on deposit with Delta Alaska; and Richard Wilmarth filed a claim for $106,593.68 for miner's gold bars which were delivered to Delta Alaska. The miner's bars of Richard Wilmarth contained approximately 167 ounces of fine gold which was to be mixed with additional fine gold to form four fifty ounce fine gold bars which would be returned to Richard Wilmarth. Delta did not have the facilities to refine gold into fine bars and sent the miner's bars (which contained significant percentages of silver) and other such gold to Delta B.C. for refining into fine gold. Richard Wilmarth acknowledged that it "appears impossible based upon the state of the records to trace the gold [of] Richard Wilmarth or the gold proceeds."

The Wilmarths agreed with Delta Alaska's trustee that their claims, which were filed as "secured or priority" are not secured because the judgment which was obtained by the Wilmarths was entered and recorded subsequent to the date Delta Alaska filed its Chapter 7 bankruptcy petition. Larry Wilmarth has agreed that his filed claim should be reduced to $32,184.06 and Richard Wilmarth has agreed that his filed claim should be reduced to $91,300.00. The trustee has concurred with the Wilmarths as to the amounts of their claims as reduced, but has allowed only $900.00 as a priority amount (based upon the trustee's interpretation of Section 507(a)(6) of the Bankruptcy Code).[4] Delta Alaska's trustee has withdrawn her objection to the timeliness of the Wilmarths' claims, but asserts that the amounts in excess of $900.00 are general unsecured claims not entitled to priority. The trustee for the Canadian bankruptcies similarly objects to the Wilmarths' claims.

## LAW

### Objections to the Wilmarth Claims

Larry Wilmarth has not presented any argument as to why his claim should be treated as a priority claim, and therefore his claim will be allowed as a general unsecured claim except for the $900.00 allowed by the trustee as a priority claim.

Richard Wilmarth asserts that a constructive trust should be imposed upon the debtor's property for the miner's bars he tendered the debtor, and that he should have a priority over the general unsecured creditors. Richard Wilmarth acknowledges that he is unable to trace the gold bars or their proceeds. Even assuming a constructive trust would be imposed under state law, a reference to state law alone will not determine Richard Wilmarth's status as a creditor. In *Elliott v. Bumb*, 356 F.2d 749, 754 (9th Cir.1966), *cert. denied* 385 U.S. 829, 87 S.Ct. 67, 17 L.Ed.2d 66 (1966), the Court quoted *Collier on Bankruptcy* to the effect that if property cannot be identified in its original or substituted form, then the claimant becomes merely a general unsecured creditor. The state statute in question in *Elliott*, however, dispensed with the need to trace the property as a prerequisite to imposing a constructive trust. The Court noted that if a state statute could impress a trust upon commingled funds in a bankruptcy case, then the states would be able to create numerous priorities by labeling them as "trusts". *Id.* at 755. The court thus held the statute invalid to the extent it conflicted with the priorities under the Bankruptcy Act. *Id.* See also *In re Esgro, Inc.*, 645 F.2d 794 (9th Cir.1981).

Even if Richard Wilmarth could trace the miner's bars, it would not necessarily follow that a trust would be recognized under the Bankruptcy Code. The record reflects that there are other creditors similarly situated to Richard Wilmarth. A creditor who

---

**4.** All references to the Code are to the Bankruptcy Reform Act of 1978, as amended in 1984, 11 U.S.C. § 101 et seq.

placed gold with the debtor with the intention of selling it to the debtor is really in no different position than a person who placed gold with the debtor with the intention of having the gold returned. The debtor's schedules reflect liabilities for metal on deposit and undelivered bullion, among other things. There is no reason why a creditor should be treated differently if the debtor fails to return the creditor's property instead of failing to pay for the property. Either creditor is equally out the same amount of money if he has tendered the same amount of gold to the debtor. Indeed, there would not appear to be any significant difference in regard to the trade account creditors who furnished services or property to the debtor.

In *In re North American Coin & Currency, Ltd.,* 767 F.2d 1573 (9th Cir.1985), the debtor opened a special trust account the week before it closed its business. The debtor deposited into the special account almost $600,000.00 received from customers for the purchase of precious metals. The debtor did not make the purchases and fill the customers' orders immediately as the debtor had suffered severe financial losses and a board meeting was scheduled to determine if the company should continue operating. If the board of directors determined that the company was to cease operations, the debtor intended at the time the account was opened that the funds in the special account would be returned to the customers. A Chapter 11 petition was filed by the debtor, but the funds in the special account were not returned to the customers or used to purchase metals to fill their orders. The customers with funds in the special account brought a class action to recover their money, claiming that the trustee held the funds subject to a constructive trust. The Court found that the claimants were only one of several comparable groups of creditors and were, therefore, not entitled to any special treatment, even though the special trust account was in existence at the time the debtor filed bankruptcy. *Id.* at 1577–1578. Accordingly, even if Richard Wilmarth's miner's bars or the proceeds thereof could

be traced, Richard Wilmarth would not necessarily be entitled to the bars or proceeds absent a showing that he was in a different position from the other unsecured creditors and therefore entitled to special treatment.

 Delta Alaska did not have Richard Wilmarth's gold at the time the bankruptcy petition was filed. Even if it had the bars, once the bars were commingled and unidentifiable, Richard Wilmarth would have no better status than a general unsecured creditor. *See In re United Precious Metals, Inc.,* 39 B.R. 14 (Bkrtcy.S.D. Fla.1984) (silver bars delivered to debtor were commingled and unidentifiable at time petition filed; claimant held to be a general unsecured creditor). Even where property subject to a bailment is sold, if the proceeds are not segregated or traceable, it is clear that the claimant is relegated to the status of a general unsecured creditor. *In re STN Enterprises, Inc.,* 45 B.R. 935, 940 (Bkrtcy.D.Vt.1984).

### Objection to Claim of Delta B.C.

The trustee, joined by the Wilmarths, objects to the claim of Delta B.C. under the provisions of § 502(b)(1) and (4) of the Bankruptcy Code, which subsections provide that a trustee shall allow a claim except to the extent that:

> (1) such claim is unenforceable against the debtor and property of the debtor, under ... applicable law for a reason other than because such claim is contingent or unmatured;
>
> . . . . .
>
> (4) if such claim is for services of an insider or attorney of the debtor, such claim exceeds the reasonable value of such services....

The trustee argues that the claim should be disallowed since the "purported loans" made by Delta B.C. to Delta Alaska "were in fact contributions to capital, and not loans; or, in the alternative, the claim is for services of an insider of the debtor and the claim exceeds the reasonable value of the services." The trustee further asserts that pursuant to § 510(c)(1) of the Bankruptcy

Code, "[i]f the claim is enforceable against debtor, the court should subordinate for the purpose of distribution all of the allowed claim to all of the other claims under the principle of equitable subordination." Section 510(c)(1) of the Bankruptcy Code provides that the court may:

> under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest....

The Wilmarths contend that the claim of Delta B.C. should be subordinated or disallowed for the reason that Delta Alaska was undercapitalized, and also argue that the claim should be subordinated pursuant to the alter ego doctrine.

A proof of claim is prima facie valid. Bankruptcy Rule 3001(f). More than the mere interposition of an objection is required to overcome the prima facie validity of a claim. *Whitney v. Dresser*, 200 U.S. 532, 26 S.Ct. 316, 50 L.Ed. 584, (1906); *In re Equipment Services, Ltd.*, 36 B.R. 241 (Bkrtcy.Alaska 1983). The objection under § 502(b)(4) that the claim of Delta B.C. is that of an insider which exceeds the reasonable value of its services cannot be sustained because of a failure of proof by the objecting party.

The trustee's objection under § 502(b)(1) of the Code raises the question as to whether disallowance rather than subordination is appropriate when the objection is based upon the undercapitalization of the debtor. Although there is some confusion in the relevant literature and cases, it has been said that a "claim should be rejected and disallowed ... when it has no basis in fact or law, is nonexistent or illegal." Herzog and Zweibel, *The Equitable Subordination of Claims in Bankruptcy*, 15 Vand.L.Rev. 83, 86 (1961). On the other hand, equitable subordination is appropriate where the real objective is to postpone payment until others have been paid. *Id.* In the instant case, if Delta

B.C.'s claim were disallowed it would not receive anything, whereas if it were subordinated under the facts of the instant case there may well still be funds available to make a distribution on the claim after all other creditors are paid. The "improbable, but not impossible, situation where a surplus may remain after payment to creditors in full" is among the reasons why a claim that "ought to be subordinated should not be penalized with disallowance." *Id.* at 87. Clearly disallowance would not be an appropriate remedy under the facts of the instant case, especially when one considers that any surplus after the payment of all other creditors would go to Delta Canada (the parent company) rather than to Delta B.C., the company that advanced the funds. Thus, the subject claim will not be disallowed under Section 502(b)(1).

The remaining and principal issue in regard to the Delta B.C. claim is whether it should be equitably subordinated pursuant to § 510(c)(1). A Judiciary Committee Report noted that:

> This section is intended to codify case law, such as *Pepper v. Litton*, 308 U.S. 295 [60 S.Ct. 238, 84 L.Ed. 281] (1939), and *Taylor v. Standard Gas and Electric Co.*, 306 U.S. 307 [59 S.Ct. 543, 83 L.Ed. 669] (1938) [1939], and is not intended to limit the court's power in any way. The bankruptcy court will remain a court of equity, proposed 28 U.S.C. § 1481; *Local Loan v. Hunt*, 292 U.S. 234, 240 [54 S.Ct. 695, 697, 78 L.Ed. 1230] (1934).

H.R.Rep. No. 95–595, 95th Cong., 1st Sess. 359 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6315. Moreover, the principles of equitable subordination "are defined by case law, and have generally indicated that a claim may normally be subordinated only if its holder is guilty of misconduct." S.Rep. No. 95–989, 95th Cong., 2d Sess. 74 (1978), U.S.Code Cong. & Admin.News 1978, p. 5860.

In *Pepper v. Litton*,[5] 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed.2d 281 (1939), Litton

**5.** In view of the facts of *Pepper*, the court's

comments at 308 U.S. 310, 60 S.Ct. at 247 (that

sought to avoid Pepper's collection of a debt from Litton's corporation. Litton had the corporation which he controlled confess judgment to him for purported salary claims that went back at least five years, had an execution issued on the judgment so that it could be used to defeat the debt to Pepper, purchased the property executed upon at the execution sale, and then caused the property to be transferred to a new corporation which Litton also owned. The first corporation filed bankruptcy and the claim of Litton was subordinated to that of Pepper. The Supreme Court noted that Litton could not "manipulate the affairs of his corporation to [the creditors'] detriment and in disregard of the standards of common decency and honesty." *Id.* at 311, 60 S.Ct. at 247. In *Taylor v. Standard Gas & Electric Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1939) (the "Deep Rock" case) Standard wholly controlled the fiscal affairs of the debtor Deep Rock. In order to prevent the preferred shareholders from obtaining any voice in the management of the debtor, Standard advanced large amounts to the debtor by which the debtor could pay dividends. (As long as the dividends were paid the preferred shareholders had no right to vote.) Additionally, among

other things, the president of the debtor, who was also the president of Standard, made false statements to bankers to the effect that the debtor owned certain property that was actually only leased. For these reasons Standard's interest was subordinated to that of the preferred stockholders. By contrast, in *Comstock v. Institutional Investors*, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 1911 (1948) there was no subordination where a parent dominated a subsidiary and had advanced funds to the subsidiary but the repayment of the financing to the parent was made impossible by the Depression and not because of any wrongdoing of the parent.

In the instant case Delta B.C. has not taken any unfair advantage of Delta Alaska. The nature of the Delta companies business put them at the center of the volatile precious metals market. The general decline in revenues of the subsidiaries as well as of the parent resulted in the bankruptcies of all three companies.

It is also important to note that in adopting § 510(c)(1) Congress expressly rejected legislative proposals which would have provided that all insider debts be subordinated.[6] The Ninth Circuit Court of Appeals

controlling stockholders' loans will be subordinated when paid-in capital is nominal) are dicta, and even if relevant would only apply to a claim made by the parent company in the instant case, Delta Canada, and not by a subsidiary such as Delta B.C. Moreover, the case cited by the Supreme Court involved an attempt to obtain a preference over other creditors by a principal taking a mortgage to secure a debt already due him because of the corporation's pending insolvency. *See Albert Richards Co. v. The Mayfair*, 287 Mass. 280, 191 N.E. 430, 434 (1934).

**6.** Clark, The Duties of the Corporate Debtor to its Creditors, 90 Harv.L.Rev. 505, 536–537 (1977); Landers, A United Approach to Parent, Subsidiary, and Affiliate Questions in Bankruptcy, 42 U.Chi.L.Rev. 589, 605 (1975). The legislative proposals were probably based on reasoning similar to that set forth by Jonathan Landers:

My preference is for outright subordination on the ground that all funds placed by a parent or affiliate in a related firm are based on the expectation of ultimate profit and are thus by nature distinguishable and distinct from the claims of creditors who lack an

equity interest. But more important than any particular rule is a penetration of the mists referred to by Justice Cardozo and an end to meaningless verbal fencing.

. . . .

This paper has suggested that the owners of an enterprise have numerous business incentives to operate it in a manner that maximizes the profits of the entire enterprise, without regard to the profitability of the individual components of that enterprise. A resolution of parent-subsidiary issues on the basis of the existence of actual harm or commingling of assets, of adequate record keeping or the observance of the formalities of separate existence, is therefore inherently unrealistic.

Id. at 604, 652 (footnote omitted). Landers subsequently wrote that:

These considerations led me to suggest that, with some significant exceptions,

(1) the parent's debt in its affiliate should always be subordinated;

(2) creditors of the subsidiary should be able to pierce the veil of the parent; and

(3) if both parent and subsidiary are bankrupt, the estates should be consolidated and all creditors should share equally.

noted in *In re Ahlswede*, 516 F.2d 784, 787 (9th Cir.1975), *cert. denied*, 423 U.S. 913, 96 S.Ct. 218, 46 L.Ed.2d 142 (1975) that:

> [T]he bankruptcy court's power to impose a result different from that prescribed by the statutory distribution scheme is not unlimited. The standard is that "[a claim's] disallowance or subordination may be necessitated by certain cardinal principles of equitable jurisprudence." *Pepper v. Litton, supra*, at 306, 60 S.Ct. at 245. In defining the nebulous "cardinal principles of equitable jurisprudence," it is important to keep in mind that the chancellor never did, and does not now, exercise unrestricted power to contradict statutory or common law when he feels a fairer result may be obtained by application of a different rule. Courts of equity have long applied standards of conscience to conduct on an individual basis to prevent formally proper but unconscionable applications of legal rules; they have not engaged in the practice of making abstract legislative judgments about the fairness of a result contemplated by the legislature's statutory scheme if it has otherwise been followed in good faith and without overreaching.

(Citation deleted). In summarizing *Pepper, Taylor*, and *Comstock* the Ninth Circuit noted in *Ahlswede*[7]:

> In the three mentioned cases the Court indicated that before a bankruptcy court may disallow or subordinate a claim, some basis must exist of the sort traditionally cognizable by equity as justifying its intervention, such as fraud, breach of fiduciary duties, mismanagement, overreaching; in fact, any breach of the multitude of "rules of fair play and good conscience" (*Pepper v. Litton, supra*, 308 U.S. at 310, 60 S.Ct. at 247) traditionally enforced by a court of equity will suffice. A supposed inequity resulting when an innocent party in good faith asserts a legally valid claim will not. *Comstock v. Group of Institutional Investors*, 335 U.S. 211, 68 S.Ct. 1454, 92 L.Ed. 911 (1948).
>
> ... In *Taylor* the controlling corporation dominated, mismanaged, and plundered the subsidiary to its own benefit and to the detriment of minority shareholders and creditors of the subsidiary to whom it owed fiduciary duties. In *Pepper* the controlling stockholder engaged in an intentional and blatant effort to manipulate corporate forms to avoid the claim of a creditor. In the third case, *Comstock*, on the other hand, both the district court and the court of appeals concluded that the controlling corporation had managed the subsidiary in good faith and fairly and that the corporation's failure was due to unavoidable business reasons. The Court accepted those findings and held that the parent's claim was properly not subordinated—thereby allowing the parent corporation to enjoy the benefits of its legally distinct corporate entity and in essence, as here, to file a claim against itself to the detriment of other creditors.

*Id.* at 788 (citation omitted). In the instant case there is no evidence of such fraud, mismanagement, or overreaching. To subordinate Delta B.C.'s claim would be to rewrite Section 510(c)(1) into a no fault subordination statute, a result which was expressly rejected by Congress.[8]

Other Ninth Circuit cases are also illustrative of these points. In *Costello v. Fazio*, 256 F.2d 903, 910 (9th Cir.

Landers, Another Word on Parents, Subsidiaries and Affiliates in Bankruptcy, 43 U.Chi.L.Rev. 527, 528 (1976). *See also* Hackney and Benson, Shareholder Liability for Inadequate Capital, 43 U.Pitt.L.Rev. 837 (1982). The Supreme Court has recognized that a group of corporations may actually operate as a single economic unit, with the corporate forms being largely paper arrangements that do not reflect the business realities. *N.L.R.B. v. Deena Artware, Inc.*, 361 U.S. 398, 403, 80 S.Ct. 441, 444, 4 L.Ed.2d 400

(1960). *See also* Berle, The Theory of Enterprise Entity, 47 Colum.L.Rev. 343 (1947).

7. For another discussion of the three Supreme Court cases, see Herzog and Zweibel, The Equitable Subordination of Claims in Bankruptcy, 15 Vand.L.Rev. 83, 104–108 (1961).

8. See Macey, No Fault Subordination of Loans in Bankruptcy, 85 Com.L.J. 44, 46–47 (1980).

1958), two partners incorporated their business and for personal gain "stripped the business of eighty-eight percent of its stated capital at a time when it had a minus working capital and had suffered substantial business losses." Thus, the appropriate remedy was subordination. Although subordination can take place even in the absence of fraud or mismanagement, there must be a showing of "suspicious inequitable conduct beyond mere initial undercapitalization of the enterprise." *In re Branding Iron Steak House*, 536 F.2d 299, 302 (9th Cir.1976). Thus, when existing capital has not been withdrawn and converted into debt there is no cause for subordination. *Id. See also Klapmeier v. Flagg*, 677 F.2d 781 (9th Cir.1982). Subordination requires a showing by specific facts that inequitable conduct of the claimant has been detrimental to the creditors. *Westgate-California v. First National Finance Corp.*, 650 F.2d 1040, 1044 n. 1 (9th Cir.1981). A court should only subordinate a claim to the extent that the claimant's actions can be shown to have harmed the creditors. To do otherwise "would be primarily punitive and not consistent with equitable principles." *In re Westgate-Cali-*

*fornia Corp.*, 642 F.2d 1174, 1179 (9th Cir. 1981).[9]

Delta B.C. is not the parent of Delta Alaska. Like Delta Alaska, Delta B.C. is a subsidiary of Delta Canada. Delta Canada has waived its claim against the debtor by not filing a proof of claim. However, there is no reason to apply Wilmarth's assertion of the alter ego doctrine or any similar rationale in regard to Delta B.C. Delta B.C. is in bankruptcy in Canada. Anything it receives on its claim will be distributed to its creditors and not to the principals of the Delta corporations, except to the extent the principals may be creditors of the Canadian companies with claims allowed under Canadian law.

■■■ Where one affiliate advances funds to another affiliate in an effort to promote the general best interests of the related companies' creditors, there is no inequity. Moreover, Delta B.C. was not in control of Delta Alaska. Control was in the hands of the parent corporation, Delta Canada. Thus such doctrines as alter ego or instrumentality[10] are not applicable to the facts of the instant case.

---

9. For a significant case from another circuit, *see Matter of Mobile Steel Co.*, 563 F.2d 692 (5th Cir.1977) wherein it is noted that equality of distribution is the underlying theme of bankruptcy law and that equitable considerations can justify only the subordination of claims, not their disallowance. Moreover, three conditions must be met in order to equitably subordinate a claim: (i) The claimant must have engaged in some type of inequitable conduct; (ii) The misconduct must have resulted in injury to the creditors of the debtor or conferred an unfair advantage on the claimant; and (iii) equitable subordination of a claim must not be inconsistent with the provisions of the bankruptcy laws. A claim should only be subordinated to the extent necessary to offset the harm caused by the inequitable conduct. Id. at 701. Although the Fifth Circuit follows a more strict rule on the effect of undercapitalization than the Ninth Circuit, the debtor in Mobile Steele was found to be adequately capitalized. *See also Matter of Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980).

Subordination must be cautiously used as a remedy. To hold that a debt may be subordinated because owed to a dominant shareholder would discourage owners from trying to salvage a business, and would require all contributions to be made in the form of equity capital. *See In*

*re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389 (10th Cir.1979).

Much has been written regarding the Second Circuit's decision in *Gannett Co. v. Larry*, 221 F.2d 269 (2d Cir.1955), wherein the claim of Gannett against its newsprint subsidiary was subordinated. Although fraud and illegality were not required, it is important to note in Gannett that at the time of Gannett's purchase of its subsidiary the subsidiary had sufficient assets to pay all of its creditors. Gannett turned the subsidiary into an unprofitable newsprint supplier to the benefit of Gannett but to the detriment of its creditors.

10. *See Jackson v. General Electric Company*, 514 P.2d 1170 (1973) for a listing of the factors to consider as to whether a subsidiary is a mere instrumentality of the parent. It has been said that the "pure instrumentality" rule is now generally rejected. *In re Mid-Town Produce Terminal, Inc.*, 599 F.2d 389 (10th Cir.1979). Depending upon the definitions being used, the agency, identity, and instrumentality rationales can be considered interchangeable. 1 Swearingen, Fletcher Cyclopedia of the Law of Private Corporations, § 43.30 (1983 rev. vol.). The instrumentality rule when fully stated is similar to subordination considerations:

It is undisputed that Richard Wilmarth delivered $91,300.00 worth of gold miner's bars to Delta Alaska. The gold bars were then forwarded by Delta Alaska to Delta B.C. to be refined and returned to Delta Alaska. Delta B.C. never returned the bars. It would not be equitable for Delta B.C. to have its claim for $1,112,900.30 share in its full amount on a parity with the other general unsecured creditors. Therefore, $91,300.00 of Delta B.C.'s claim will be subordinated to the claims of the other general unsecured creditors.

## CONCLUSION

Creditor Larry Wilmarth is entitled to have his claim allowed in the amount of $900.00 as a § 507(a)(6) priority, and the balance of $31,284.06 as a general unsecured claim for the reason that he failed to establish any basis for his claim to a greater priority.

Richard Wilmarth is entitled to have his claim allowed in the amount of $900.00 as a § 507(a)(6) priority and $90,400.00 as a general unsecured claim. His claim to a constructive trust fails since, among other reasons, he is unable to trace his gold or the proceeds.

Delta B.C. is allowed a general unsecured claim in the amount of $1,112,900.30; however, $91,300.00 of the claim shall be subordinated to the claims of the other general unsecured creditors because of Delta B.C.'s failure to return that amount of gold value to Delta Alaska. Thus, Delta B.C. is in effect allowed a general unsecured claim in the amount of $1,021,600.30 to share on a parity with the other general unsecured creditors. No dividend will be paid on the $91,300.00 because the assets are insufficient to reach the subordinated amount. Delta B.C. has acted in good faith and has not sought to take advantage of any party. Delta B.C. is not the parent of Delta Alaska, and even if it were to be treated as having the same status as a parent there would be no reason to subordinate its claim based on the under-capitalization of Delta Alaska. The problems of all the Delta companies stemmed from the volatile precious metals market and a substantial decline in sales. Since the Delta companies in Canada are in bankruptcy, there is no inequity in allowing the Canadian creditors of Delta B.C. to share on a parity through their trustee with the other general unsecured creditors of Delta Alaska, subject to the exception noted above.

An order will be entered in accordance with this opinion.

The test may be stated as follows: In any given case, except express agency, estoppel, or direct tort, three elements must be proved:

"(1) Control, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own; and

"(2) Such control must have been used by the defendant to commit fraud or wrong, to perpetuate the violation of a statutory or other positive legal duty, or dishonest and unjust act in contravention of plaintiff's legal rights; and

"(3) The aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of."

Id. at § 43.10 (footnote omitted). *See also State, Department of Environmental Protection v. Ventron Corporation,* 94 N.J. 473, 468 A.2d 150 (1983):

Under certain circumstances, courts may pierce the corporate veil by finding that a subsidiary was "a mere instrumentality of the parent corporation." ... Application of this principle depends on a finding that the parent so dominated the subsidiary that it had no separate existence but was merely a conduit for the parent.... Even in the presence of corporate dominance, liability generally is imposed only when the parent has abused the privilege of incorporation by using the subsidiary to perpetrate a fraud or injustice, or otherwise to circumvent the law.

(Citations omitted); *see also McKibben v. Mohawk Oil Co., Ltd.,* 667 P.2d 1223, 1229 (Alaska 1983).