**In re OUTDOOR SPORTS HEADQUARTERS, INC., successor by merger to Munson Sporting Goods Co., Inc. and Seven Seas Products, Inc. and successor in interest to Southern Gun & Tackle, Inc., J.W. Murchison Company, Inc., Gopher Shooter's Supply Company, Inc., Dickerson Supply Company, Inc., Oscar Robbins and Company, Central Sales Corp., M. Sharf & Co., Southeastern Sporting Goods, Whitney Sporting Goods Company and Alpha Sports, Inc. doing business as Ressus Sporting Goods Co., Inc.**

**Bankruptcy No. 3–91–03160.**

United States Bankruptcy Court,
S.D. Ohio,
Western Division.

May 27, 1994.

Marvin L. Karp, Michael N. Ungar, Cleveland, OH, Richard Boydston, Cincinnati, OH, for First Nat. Bank, Dayton.

Thomas H. Bernin, Michael R. Stewart, Charles F. Webber, Minneapolis, MN, for Variable Annuity Life Ins. Co., American Gen. Life and Acc. Ins. Co. and Washington Square Capital.

## DECISION ON ORDER DENYING FIRST NATIONAL BANK, DAYTON'S MOTION FOR SUMMARY JUDGMENT ON OBJECTION FILED BY VARIABLE ANNUITY LIFE INSURANCE COMPANY ET AL. ("THE NOTEHOLDERS")

THOMAS F. WALDRON, Bankruptcy Judge.

This proceeding, which arises under 28 U.S.C. § 1334(b) in a case referred to this court by the Standing Order of Reference entered in this district on July 30, 1984, is determined to be a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(B)—allowance or disallowance of claims against the estate.

On June 18, 1992, the court confirmed the debtor's plan of reorganization (the "Plan"). The Plan was recommended for confirmation by the Unsecured Creditors' Committee whose members include, among others, First National Bank, Dayton, The Variable Annuity Life Insurance Co., and Washington Square Capital, Inc. No objections to the Plan were filed.

Under the Plan, First National Bank, Dayton ("FNBD") has the largest unsecured claim, totalling approximately $46 million. The Variable Annuity Life Insurance Company, American General Life and Accident Insurance Company, and Washington Square Capital (the "Noteholders") hold the second largest amount of unsecured claims, totalling approximately $25 million. FNBD and the Noteholders are in the same class, C–2. The order confirming the Plan provides that holders of C–2 claims "shall receive, collectively, cash distributions of $48,575,000 and 30,000 shares of Preferred Stock (as defined in the Plan) having a value as of the Effective Date [the date which is eleven days after confirmation] of $1,098,254." (Doc. 326–1, p. 2). A disbursing agent will distribute the unscheduled payments "to the holders of Class C–2

claims, pro rata, in proportion to the Allowed amounts of such claims." (Doc. 328–1, p. 12). The Plan also provides:

> Parties in interest other than the Debtor and the [Official Unsecured Creditors'] Committee shall have the right to review and, if appropriate, pursue *all objections* to claims asserted against the Debtor's estate.... *Any and all objections* to such claims filed by a party in interest other than the Committee must be filed by thirty (30) days after the Effective Date or be forever barred.

(Doc. 328–1, p. 25) (emphasis added). The Plan further provides that the bankruptcy court shall retain jurisdiction to hear and determine "any objection to a claim which is filed with the court by the Committee or a party in interest other than the Debtor." (Doc. 328–1, p. 39).

On June 26, 1992, the Noteholders filed an objection (Doc. 334–1) to the claim of FNBD, stating the following:

4. Beginning in or around 1988, Outdoor Sports Headquarters ("the Debtor") wanted to refinance existing variable rate bank debt at a fixed rate of interest.

5. The debtor had a long standing and close relationship with FNBD and was indebted to FNBD for about $34.5 million.

6. National City Bank ("NCB"), a sister bank of FNBD, held a participation interest in the Debtor's indebtedness to FNBD.

7. The Debtor called on First National Financial Corporation ("FNFC"), a sister corporation of FNBD and NCB, for help during June of 1989 because the Debtor needed access to capital markets. FNFC began to solicit investors willing to help the Debtor's refinancing efforts.

8. FNFC successfully solicited the Noteholders to participate in the purchase of the Debtor's issuance of $25 million of 9.96% senior notes ("the Notes") due in 1999. The Debtor used the $25 million to pay down debt at FNBD and NCB.

9. FNFC's investment bankers negotiated the terms of the Note Purchase Agreement between the Debtor and the Noteholders.

10. FNFC prepared and presented a term sheet to the Noteholders that included financial convenants [sic]. The Debtor, the Noteholders, and FNFC specifically negotiated the extent to which the Debtor would be allowed to borrow additional funds subsequent to the transaction. The parties eventually agreed on certain financial restrictions on the Debtor's further borrowing (including debt tests, Fixed Charge Coverage, and Current Ratio), which agreement was a condition precedent to financing the transaction with the Noteholders.

11. FNBD knew of the status and terms of the negotiations and knew of the financial restrictions that the negotiating parties agreed upon.

12. The Debtor and the Noteholders executed a Note Purchase Agreement ("the Note Purchase Agreement") dated November 7, 1989.

13. In connection with the execution of the Note Purchase Agreement, and on or about the date of its execution, the Debtor told the Noteholders that it did not plan to acquire other businesses in the near future.

14. In mid-March of 1990, the Debtor told the Noteholders that during January and February of 1990 it had acquired the assets of two other sporting goods wholesalers (J.W. Murchison Co. and Alpha Sports, Inc.) and the stock of a third wholesaler (Munson Sporting Goods Co., Inc.). The total purchase price of these acquisitions was approximately $27 million.

15. The Debtor financed the acquisitions through new loans from FNBD and only after consultation with and advice from FNBD regarding the acquisitions.

16. FNBD increased the Debtor's credit line from $30 million to $55 million to accommodate the new borrowing and revised the provisions of FNBD's line of credit agreement with the Debtor in order to allow for the new borrowing.

17. The Debtor did not inform the Noteholders of these acquisitions prior to making them.

18. The Note Purchase Agreement requires that any acquisitions not lead to an

event of default under the Note Purchase Agreement. The loans from FNBD to the Debtor for the acquisitions did lead to events of default under the Note Purchase Agreement because of, among other things, the Debtor's breach of the Fixed Charge Coverage and Current Ratio covenants of the Note Purchase Agreement. In addition, the increased debt and loss of liquidity put a severe strain on the Debtor's ability to operate effectively.

19. The Debtor has admitted to these defaults on numerous occasions, including in its March 31, 1990 quarterly financial statement reporting and later Form 10–Q filings with the Securities Exchange Commission.

20. In May of 1990, the Debtor and FNBD agreed that the Debtor would mortgage approximately $5.7 million of the Debtor's prime real estate assets to the Metropolitan Life Insurance Company in order to pay down some of the Debtor's debt to FNBD incurred to finance these acquisitions. An affiliate of FNBD received a fee for placing the mortgage loan, which the Debtor entered into despite the Noteholders' written and oral objections.

21. After these acquisition transactions, and in part because of the Debtor's weakened cash position and capital structure, the Debtor began losing money.

22. Commercial and investment bankers from FNBD, FNFC, and NCB became involved in negotiations with the Noteholders and acted as agents for the Debtor in an attempted restructuring and purchase of the Notes.

23. FNBD and NCB formulated several restructuring plans that they brought to the Noteholders prior to the filing of bankruptcy petitions affecting the Debtor. Communications between the parties relating to the workout plans went through FNBD and/or NCB, not the Debtor. Between April of 1990 and December of 1991, FNBD applied approximately $10 million to the Debtor's outstanding indebtedness, reducing FNBD's total exposure to the Debtor from approximately $55 million to approximately $45 million.

Based upon these assertions, the Noteholders allege that FNBD's claim should be disallowed in its entirety or, alternatively, FNBD's claim should be subordinated, in its entirety, to the claims of the Noteholders. Specifically, the Noteholders assert that FNBD acted inequitably because: 1) FNBD knew or should have known that the additional debt it extended to the debtor would result in violations of the covenants in the Note Purchase Agreement upon funding of the FNBD loan, thus creating events of default under the Note Purchase Agreement; 2) FNBD induced the debtor to breach the covenants of the Debtor's agreement with the Noteholders; 3) FNBD had control over the affairs of the debtor by virtue of, among other things, its participation in the debtor's financial decision making and by its control over the debtor's financial structure, and FNBD used its control to enrich itself at the expense of the Noteholders.

FNBD filed a motion to dismiss the Noteholders' objection, alleging in relevant part that inequitable conduct is not a valid ground for disallowing a claim. An order denying FNBD's motion to dismiss was entered on November 24, 1992. (Doc. 778–1). Presently pending before this court for determination is a motion entitled First National Bank, Dayton's Motion For Summary Judgment On Objection Filed By Variable Annuity Life Insurance Company Et Al. ("The Noteholders") (Doc. 1028–1) filed by FNBD. The Noteholders filed Noteholders' Response To First National Bank Dayton's Motion For Summary Judgment On Objection Filed By Noteholders (Doc. 1077–1). FNBD also filed First National Bank, Dayton's Reply Brief In Support Of Motion For Summary Judgment (Doc. 1083–1) and First National Bank, Dayton's Supplemental Memorandum In Support Of Motion For Summary Judgment On Objection Filed By Variable Annuity Life Insurance Company, Et Al. ("The Noteholders") (Doc. 1198–1). Additionally, the Noteholders filed Noteholders' Response To First National Bank, Dayton's Supplemental Memorandum In Support Of Its Motion For Summary Judgment On Objection Filed By Noteholders (Doc. 1201–1).

Summary judgment is governed by Federal Rule of Bankruptcy Procedure 7056 which incorporates Rule 56 of the Federal Rules of Civil Procedure. Rule 7056(c), in relevant part, provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law.

FNBD asserts that, as a matter of law, it is entitled to summary judgment.

FNBD alleges that it is entitled to summary judgment because the basis of the Noteholders' objection, inequitable conduct on the part of FNBD towards the Noteholders and other creditors, but not the debtor, cannot support disallowance of FNBD's claim. FNBD's argument was rejected by this court when it denied FNBD's motion to dismiss the Noteholders' objection. Section 502(b)(1) provides that if an objection to a claim is made, the court, after notice and a hearing, shall allow the claim "except to the extent that—(1) such claim is unenforceable against the debtor and property of the debtor, under any agreement or *applicable law* for a reason other than because such claim is contingent or unmatured." (Emphasis added). Applicable law constitutes the appropriate state or federal law. Conflicting federal case law exists on the issue of whether a claim may be disallowed upon equitable principles. In *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939), the Supreme Court, in analyzing bankruptcy courts' equitable powers, held that a claim may be disallowed pursuant to equitable considerations. Specifically, the Court stated that if "a claim which has been allowed may be later 'rejected in whole or in part, according to the equities of the case,' disallowance or subordination in light of equitable considerations may originally be made." *Id.* at 303, 60 S.Ct. at 243. Likewise, the Eighth Circuit stated:

> 'The legality of a claim for a purely technical aspect does not preclude its disallowance or subordination on equitable grounds. The bankruptcy court in passing on claims sits as a court of equity. It has the power to disallow or subordinate claims in the light of equitable considerations and can sift the circumstances surrounding any claim to see that injustice or unfairness is not done in the administration of the bankruptcy estate. This power exists as a matter of the Federal law of bankruptcy.'

*Northtown Theatre Corp. v. Mickelson*, 226 F.2d 212 (8th Cir.1955) (quoting 6 Am.Jur. at p. 809). The Fifth Circuit, however, in *Benjamin v. Diamond (In re Mobile Steel Co.)*, 563 F.2d 692, 699 (5th Cir.1977) stated that "equitable considerations can justify only the subordination of claims, not their disallowance." *See also In re Century Inns, Inc.*, 59 B.R. 507 (Bankr.S.D.Miss.1986); *In re Delta Smelting & Refining Alaska, Inc.*, 53 B.R. 877, 883 (Bankr.D.Alaska 1985).

■ FNBD asserts that the enactment of 11 U.S.C. § 510(c) vitiates case law which holds that a claim may be disallowed under equitable principles. Section 510(c)(1) states:

> Notwithstanding subsections (a) and (b) of this section, after notice and a hearing, the court may—
>
> (1) under principles of equitable subordination, subordinate for purposes of distribution all or part of an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all or part of another allowed interest[.]

The plain language of § 510(c)(1) pertains solely to the subordination of *allowed* claims based on equitable principles and is silent with regard to whether a claim may be disallowed on equitable principles, the issue in this proceeding. The legislative history, however, acknowledges that § 510(b) was enacted to codify case law such as *Pepper* and *Taylor v. Standard Gas and Elec. Co.*, 306 U.S. 307, 59 S.Ct. 543, 83 L.Ed. 669 (1938), and expressly states that § 510(b):

> [I]s not intended to limit the court's power in any way.... Nor does this subsection preclude a bankruptcy court from completely disallowing a claim in appropriate circumstances. *See Pepper v. Litton*, supra.

H.R.Rep. No. 595, 95th Cong., 2nd Sess. 359 (1977), U.S.Code Cong. & Admin.News 1978, pp. 5787, 6315. A court should be reluctant to accept arguments that would interpret the Code to "effect a major change in pre-Code practice that is not the subject of at least some discussion in the legislative history," *Dewsnup v. Timm,* —— U.S. ——, ——, 112 S.Ct. 773, 779, 116 L.Ed.2d 903 (1992), let alone an argument completely contrary to express legislative history.

■ Based upon the foregoing, the court determines that authority exists which would authorize the court to disallow a claim based upon equitable principles. Thus, the Note-holders' objection based upon FNBD's alleged inequitable conduct could support a claim for disallowance. Accordingly, with respect to this argument, FNBD is not entitled to summary judgment as a matter of law. Whether the Noteholders have established that FNBD's claim should be disallowed under equitable principles and is "unenforceable against the debtor and property of the debtor," as § 502(b)(1) requires, is not presently before this court. This issue is before the court only in connection with a motion for summary judgment, without testimony or all available evidence.

FNBD also argues that the Noteholders' objection, because it essentially seeks to "re-prioritize" FNBD's claim by subordinating it, should have been raised at confirmation and is therefore barred under the doctrine of *res judicata.* FNBD further asserts that the Plan provision allowing objections to be filed subsequent to confirmation does not include claims for subordination. Consequently, FNBD asserts that, because the Noteholders' objection is not an objection, it does not come within the Plan provision which provides that the bankruptcy court shall retain jurisdiction to hear and determine "any objection to a claim which is filed with the court by the Committee or a party in interest other than the Debtor." (Doc. 328–1, p. 39). The Noteholders respond by stating that they were not required to bring their claim for subordination prior to confirmation because the Plan involves resolution of debtor-creditor disputes, not creditor-creditor disputes. The Noteholders further state that their ob-

jection comes within the provision of the Plan permitting objections.

■ *Res judicata,* also referred to as claim preclusion, requires that four elements be satisfied:

1. A final decision on the merits in the first action by a court of competent jurisdiction;

2. The second action involves the same parties, or their privies, as the first;

3. The second action raises an issue actually litigated or which should have been litigated in the first action;

4. An identity of the causes of action.

*Sanders Confectionery Products, Inc. v. Heller Financial, Inc.,* 973 F.2d 474, 480 (6th Cir.1992).

■ The first two elements have clearly been met. Confirmation of a plan of reorganization is a final judgment on the merits. *Id.* (citing *Stoll v. Gottlieb,* 305 U.S. 165, 59 S.Ct. 134, 83 L.Ed. 104 (1938)); *In re Dooley,* 116 B.R. 573 (Bankr.S.D.Ohio 1990). Additionally, § 1141(a) of the Code provides that "the provisions of a confirmed plan bind the debtor ... and any creditor." The order confirming the debtor's Plan is a final decision entered on its merits by a court of competent jurisdiction. Also, the parties in this proceeding were parties to the confirmation proceeding, and the Noteholders had a full and fair opportunity to raise their objection at the confirmation proceeding.

■ The third element of *res judicata,* prohibiting parties from bringing claims they have already brought or should have brought, has not been met. The Noteholders' objection is not a claim which has already been brought in this proceeding. Thus, the sole issue with respect to this element is whether the Noteholders' objection is one which should have been brought during the confirmation proceedings.

The provisions of a confirmed plan of reorganization create and establish the new relationships that a debtor has with its creditors after filing for bankruptcy relief. However, a confirmed plan does not establish new relationships between creditors of a debtor un-

less a plan expressly contains such provisions.

In this proceeding, neither the debtor's disclosure statement nor the debtor's Plan contain provisions which pertain to allowance or disallowance or suggest or require that the action of any creditor, including the Noteholders, be brought against any other creditor, including FNBD. Such a provision could have been included in the Plan. FNBD was a participating creditor in the Official Unsecured Creditors' Committee, which had an active, if not dominant, role in overseeing the drafting of this debtor's Plan. In addition, and of significance, FNBD did not object to the confirmation of the Plan.

Furthermore, FNBD's role in this Plan is particularly notable because the Plan expressly allows for "objections" to claims to be filed within thirty days of confirmation. The Plan could have defined "objections" in a restrictive manner or limited the scope of the meaning of "objections" by expressly requiring language providing that an objection does not include a claim for subordination or by including the more restrictive phrase, "objection to *allowance of* claims," but failed to do so. The Plan does not define its use of the word "objection," nor does any other provision of the Plan assist in determining its scope and meaning. Because the term objection is not restricted in any manner in the Plan and is not defined in the Bankruptcy Code or Rules, this court concludes that based upon the general use of the word objection and its ordinary meaning,[1] "any adverse reason raised to oppose a matter or proceeding," see *Black's Law Dictionary* at 967–68 (5th ed. 1979), objection is not limited to allowance or disallowance of claims, but includes the concept of subordination. *Cf. In re Melon Produce, Inc.,* 162 B.R. 386, 388 (Bankr.D.Mass.1993) (trustee's agreement that he would not object to a claim "subsumes that he would not seek to have it equitably subordinated.").

Having determined that it is an objection, it also comes within the Plan provision which allows for this court to retain jurisdiction to determine these issues. Consequently, under these circumstances, the doctrine of *res judicata* is not applicable to bar the Noteholders' timely filed objection.

The fourth element of *res judicata* has also not been satisfied. The fourth element requires that there be an identity in the causes of action. "Identity of causes of action means an 'identity of the facts creating the right of action and of the evidence necessary to sustain each action.'" *Sanders,* 973 F.2d at 484 (quoting *Westwood Chemical Co. v. Kulick,* 656 F.2d 1224, 1227 (6th Cir.1981)). What is important for this inquiry is whether the claim should have been considered, not necessarily whether a claim is compulsory. *Id.* Thus, this element requires an analysis similar to that required by the third element of *res judicata.* As previously stated, the confirmation of the Plan involved the presentation of facts involved in the relationship between the debtor and FNBD. These are not the same facts involved in the dispute between FNBD and the Noteholders. Thus, there is no identity of the causes of action.

Based upon the foregoing, First National Bank, Dayton's Motion For Summary Judgment On Objection Filed By Variable Annuity Life Insurance Company Et Al. ("The Noteholders") (Doc. 1028–1) is **DENIED.**

An order in accordance with this decision is simultaneously entered.

---

1. *Pioneer Investment Services Co. v. Brunswick Assocs. Ltd. Partnership,* —— U.S. ——, ——, 113 S.Ct. 1489, 1494, 123 L.Ed.2d 74 (1993) (absent evidence to the contrary, courts should apply the ordinary meaning of words).